# **Exhibit A**

Memorandum & Order
*Sonya Larson v. Dawn Perry*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SONYA LARSON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:19-cv-10203-IT |
| | * | |
| DAWN DORLAND PERRY, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

September 14, 2023

TALWANI, D.J.

Eight years ago, Dawn Dorland Perry ("Dorland") wrote a letter about her altruistic kidney donation and shared that letter with Sonya Larson ("Larson") and others. After reading Dorland's letter, Larson wrote a short story entitled The Kindest, in which a kidney recipient is none too happy to receive a letter from her living donor.

When Dorland read an online version of The Kindest in 2018, she noted the similarities between her letter and the letter in the story. Dorland alerted publishers, writing conferences, and journalists to what she considered Larson's plagiarism and ethical betrayal. Dorland's communications resulted in The Kindest being pulled from online publication with American Short Fiction. They also resulted in the Boston Book Festival cancelling its annual One City, One Story event, which had planned to feature The Kindest in 2018.

Larson filed suit against Dorland, claiming that Dorland's allegations of plagiarism amounted to defamation, and that Dorland's repeated communications with American Short Fiction and the Boston Book Festival constituted intentional interference with Larson's business relationships. Larson also sought a declaration that she owns the copyright to The Kindest and

that the letter in the short story does not infringe Dorland's copyright. Dorland counterclaimed for copyright infringement, claiming that Larson's use of Dorland's letter was a violation of intellectual property law.

Pending before the court is Dorland's <u>Motion for Summary Judgment</u> [Doc. No. 180] and Larson's <u>Cross-Motion for Summary Judgment</u> [Doc. No. 187]. Both parties seek rulings on each of the three legal issues: copyright infringement, defamation, and intentional interference with business relationships. For the following reasons, the court rules in Larson's favor and against Dorland on the copyright claims and in Dorland's favor and against Larson on the defamation and intentional interference claims.

## I.      Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Baker v. St. Paul Travelers Ins.</u>, 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. <u>Id.</u> at 331.

2

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing on] mere allegation[s] or denials of [the] pleading[s]." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255. However, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

The filing of cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each party, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting that cross-motions for

summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

## II.    Factual Background

### A.  Dorland Documents Her Kidney Donation on Facebook

In 2015, Dorland started a kidney donation chain by becoming a living kidney donor to an undesignated recipient. Dorland Resp. to Larson Statement of Undisputed Material Facts (Dorland Resp. SUMF) ¶ 3 [Doc. No. 195]. Prior to her surgery, Dorland invited people she thought would be interested in, or supportive of, her decision to a private Facebook group she created. Id. at ¶ 4; Dorland Mem. SJ, Ex. B [Doc. No. 181-2]. One of these invitees was Sonya Larson. Dorland Resp. SUMF ¶ 6 [Doc. No. 195]. On July 7, 2015, shortly after her surgery, Dorland shared with the Facebook group her letter to the final member of the kidney donation chain. Id. at ¶ 13; Larson Resp. to Dorland Statement of Undisputed Material Facts (Larson Resp. SUMF) ¶ 3 [Doc. No. 197]; Dorland Mem. SJ, Ex. C (Dorland Letter) [Doc. 181-3]. In the caption to her Facebook post, Dorland wrote: "For those who are interested, I'm happy to share a letter here that I composed to our Portland recipient . . . which got shared widely around the UCLA transplant team." Dorland Mem. SJ, Ex. C [Doc. No. 181-3].

### B.  Larson Reads Dorland's Letter and Writes a Short Story, The Kindest

Larson saw and read the Dorland Letter when it was posted on Facebook. Dorland Resp. SUMF ¶ 19 [Doc. No. 195]; Larson Mem. SJ, Ex. 1 (Larson Affidavit) ¶ 6 [Doc. No. 189-1]; Larson Resp. SUMF ¶¶ 4,6 [Doc. No. 197]. Shortly thereafter, Larson began drafting a short story. Larson Resp. SUMF ¶ 5 [Doc. No. 197]. In The Kindest, Chuntao, a Chinese-American woman, requires a kidney transplant after crashing her car into a tree while driving drunk. Larson Mem. SJ, Appendices I-V (various versions of The Kindest) [Doc. Nos. 193-1-5]. Chuntao

4

miraculously receives a kidney from an anonymous living donor. Id. As Chuntao is recovering

from her surgery and accident, she receives a handwritten letter from the donor, Rose. Id. The

letter reveals some of Rose's personal history, and her desire to meet Chuntao. Id. Chuntao's

husband, Bao, is thrilled and honored to invite Rose to their home. Id. Chuntao, however, has

deeply conflicting feelings about meeting Rose and about the letter itself. Id. These negative

feelings intensify throughout the story, as Chuntao's resentment and contempt for Rose become

increasingly evident. Id. (When Chuntao learns Rose is coming to her home: "I wanted to be

sick, to hide under the table." When Rose arrives, Chuntao asks Bao: "She's the kindest bitch on

the planet?" Later, Chuntao's internal monologue: "What is this, this white woman, crying on

my couch? Crying to *me*. I felt bad for her, but I also wanted to slap her.").

Dorland's kidney donation and the letter Dorland posted to Facebook both served, at least

partially, as Larson's inspiration for The Kindest. Larson Resp. SUMF ¶ 6 [Doc. No. 197];

Dorland Resp. SUMF ¶ 19 [Doc. No. 195]. In a text message to a friend, Larson stated that the

story "literally has sentences that I verbatim grabbed from Dawn's letter on Facebook. I've tried

to change it but I can't seem to. That letter was just too damn good." Dorland Mem. SJ, Ex. RR

(Larson Deposition) [Doc. No. 182-18]; Id., Ex. J (Larson Text) [Doc. No. 181-10]. In other

messages shared with friends and fellow writers, Larson expressed that her source of

"inspiration" was not limited to Dorland's kidney donation and letter but included Dorland

herself. Id., Ex. R [Doc. No. 181-18]; Id., Ex. UU [Doc. No. 182-21] (text to Whitney Sharer);

Id., Ex. RR 49:18-24 (Larson Deposition) [Doc. No. 182-18] (confirming that "the kidney donor

was named Dawn in [the first draft of] your story").

### C.  Larson Submits The Kindest for Publication and Audio Recording

In late 2015, Larson submitted a version of The Kindest to Plympton, a "literary studio"

that helps authors sublicense their work to other audio recording studios. Larson Resp. SUMF

¶ 17 [Doc. No. 197]; Larson Second Amended Complaint (Amended Complaint) ¶ 27 [Doc. No. 91]. Several lines of the Dorland Letter appear verbatim, or nearly verbatim in the version of the letter that appears in this iteration of the story. Dorland Letter [Doc. No. 181-3]; Larson Mem. SJ, Appendix I [Doc. No. 193-1].[1]

Plympton was successful in sublicensing The Kindest to Audible, which agreed in late 2015 to publish The Kindest as an audiobook. Dorland Mem. SJ, Ex. H [Doc. No. 181-8]. In February 2016, Larson signed a contract allowing Plympton to sublicense the story for audiobook recording purposes. Larson Mem. SJ, Ex. 9 (Plympton Contract) [Doc. No. 189-9]. Audible, through its subsidiary Brilliance Audio, published a recorded version of The Kindest online on August 3, 2016. Larson Amended Complaint ¶ 30 [Doc. No. 91]; Larson Resp. SUMF ¶ 11 [Doc. No. 197].

### D. Dorland Discovers Larson Is Writing a Kidney Story

In June 2016, Larson read an excerpt of The Kindest at a reading at a Boston bookstore. Dorland Mem. SJ, Ex. RR 51:3-17 (Larson Deposition) [Doc. No. 182-18]. Subsequently, Dorland emailed Larson that she had heard that Larson was working on a short story about kidney donation and asked to read it. Dorland Mem. SJ, Ex. N (Dorland-Larson Email Chain) [Doc. No. 181-14]; Larson Amended Complaint ¶ 21-22 [Doc. No. 91]. Larson wrote that she was working on a story on kidney donation "partially inspired by how [her] own imagination took off after learning of [Dorland's] own tremendous donation." Dorland Mem. SJ, Ex. N

---

[1] On January 18, 2016, Larson submitted the same draft of The Kindest for publication in The New Yorker and The Atlantic. Dorland Mem. SJ, Ex. L (Dorland email to the New Yorker) [Doc. No. 194-12]; Ex. M (The Kindest submission to the New Yorker) [Doc. No. 194-13]; Dorland Mem. SJ, Ex. I [Doc. No. 181-9]. A month later, on February 29, 2016, Larson submitted The Kindest for publication in Glimmer Train Magazine. Id. None of these magazines published the story.

(Dorland-Larson Email Chain) [Doc. No. 181-14]. Larson also told Dorland that she "d[id]n't feel quite ready to show the full thing to people," but that "[she]'d be happy to send it once it's finished." Id.; Larson Resp. SUMF ¶ 12 [Doc. No. 197].

### E. Larson Attempts to Change the Letter in the Audiobook Version of *The Kindest*

A few days after that email exchange, and a day after Audible published the first version of the audio recording, Larson contacted Plympton and requested that the story be re-recorded because the letter in The Kindest "includes a couple sentences that I'd excerpted from a real-life letter," and "for ethical reasons I am uncomfortable keeping those lines in." Dorland Mem. SJ, Ex. O [Doc. No. 181-15]; Larson Resp. SUMF ¶ 10 [Doc. No. 197]. Larson then sent the company a revised iteration of The Kindest, including a new letter in which much less of Dorland's original letter appears, although the letter's structure and organization remained similar. Dorland Mem. SJ, Ex. S [Doc. No. 181-19]. That re-recorded version of the story was published as an audiobook on Audible.com in October 2016. Dorland Resp. SUMF ¶ 22 [Doc. No. 195]. However, the original audiobook version of The Kindest—including the unedited version of the letter—remained publicly available for purchase online. Larson Resp. SUMF ¶ 11 [Doc. No. 197]; Dorland Mem. SJ, Ex. FF [Doc. No. 182-6].

### F. American Short Fiction Publishes a Revised Version of *The Kindest*

In the summer of 2017, Larson submitted her revised version of The Kindest—including the edited version of the letter—to American Short Fiction ("ASF"), where the story was accepted for print publication. Larson Resp. SUMF ¶ 13 [Doc. No. 197]; Dorland Mem. SJ, Ex. T (Markovits Email) [Doc. No. 181-20]. That summer, ASF included The Kindest in a print-bound collection of short stories. Larson Resp. SUMF ¶ 13 [Doc. No. 197]. A year later, in May 2018, ASF released an online version of The Kindest. Id. at ¶ 14; Dorland Resp. SUMF ¶ 22 [Doc. No. 195].

7

### G.  *Larson Wins the Boston Book Festival's One City/One Story Competition*

In May 2018, the Boston Book Festival ("BBF") informed Larson that The Kindest had won the One City/One Story (1C1S) competition. Larson Amended Complaint ¶ 35 [Doc. No. 91]. Larson and BBF executed an agreement allowing BBF to use the story in 1C1S-related events, which would have included distributing thousands of copies of the story around the greater Boston area in October 2018. Larson Mem. SJ, Ex. 16 [Doc. No. 190-6]; Amended Compl. ¶ 35 [Doc. No. 91]. BBF's contract with Larson did not require BBF to pay Larson for the use of the story, or otherwise offer compensation for 1C1S-related activities. Larson Mem. SJ, Ex. 16 [Doc. No. 190-6].

### H.  *Dorland Contacts American Short Fiction, the Boston Book Festival, and Others, and Registers the Copyright for her Letter*

In early June 2018, Dorland read the online version of The Kindest released by ASF. Dorland Resp. SUMF ¶ 23 [Doc. No. 195]; Larson Resp. SUMF ¶ 15 [Doc. No. 197]. Dorland recognized "similarities" between her Facebook letter and the letter in the story. Dorland Resp. SUMF ¶ 24 [Doc. No. 195]; Larson Resp. SUMF ¶ 19 [Doc. No. 197]; Larson Mem. SJ, Ex. 12 [Doc. No. 190-2]. On June 4, 2018, Dorland contacted Rebecca Markovits, the Co-Editor of ASF. Dorland Mem. SJ, Ex. Z [Doc. No. 181-26]. In an email bearing the heading "Plagiarism in 'The Kindest,'" Dorland wrote that Larson had been privy to information related to Dorland's kidney donation, had "acknowledged that the short story she was working on was indeed informed by [Dorland's] gesture," and had published the story with ASF "without ever acknowledging" Dorland. Id. In bold letters, Dorland wrote, "BUT HERE'S THE PROBLEM: My friend's kidney story, 'The Kindest,' includes a letter from a donor to her recipient. I believe that the letter in Sonya's story plagiarizes the letter that I wrote to the final recipient in my short kidney chain, a letter to which Sonya had access…." Id. Dorland stated that she would "forward

[her] own kidney letter as a separate email attachment for [ASF's] comparison" to see "if [ASF] agree[d] that the letter in Sonya's story bears a problematic resemblance to the one that I composed…." Id. Dorland then outlined a number of "remedies [she] would find acceptable," including pulling the article, adding an acknowledgement of Dorland's own work, and/or allowing Dorland to write a piece for ASF on "ethical issues germane to all writers." Id.

Dorland also deduced from Larson's personal webpage that Larson had won 1C1S. Dorland Resp. SUMF ¶ 33 [Doc. No. 195]. On June 7, 2018, Dorland repeated her plagiarism charge to BBF, again offering to provide her own kidney letter for comparison. Dorland Mem. SJ, Ex. BB [Doc. No. 182-2].

Dorland also contacted other parties besides ASF and BBF about The Kindest and Larson.[2] Dorland Mem. SJ, Ex II [Doc. No. 182-9] (email to Dear Sugars podcast); Id., Ex. JJ [Doc. 182-10] (Twitter direct message to Kat Rosenfield); Id., Ex. Y [Doc. 181-25] (email to Samantha Shea); Larson Mem. SJ, Ex. 18 [Doc. No. 190-8] (email to Michael Collier).

On June 7, 2018, Dorland emailed the Breadloaf Writer's Conference ("Breadloaf"), a writing program to which Larson had won a fellowship in 2017. Dorland Resp. SUMF ¶ 37 [Doc. No. 195]; Dorland Mem. SJ, Ex. CC [Doc. No. 182-3]. In the email, Dorland inquired whether a 2017 tuition fellow—Dorland did not specifically name Larson—had applied using The Kindest as part of her portfolio. Dorland Mem. SJ, Ex. CC [Doc. No. 182-3]. Dorland then stated that The Kindest included a letter that had plagiarized Dorland's original work. Id.

---

[2] In her affidavit, Larson lists approximately 30 individuals and entities contacted by Dorland. Larson Mem. SJ ¶ 17 [Doc. No. 189-1] (Affidavit of Sonya Larson). Dorland does not deny these contacts but notes that some of these individuals are leaders or members of the named organizations. Dorland Resp. SUMF ¶ 41 [Doc. No. 195].

On June 10, 2018, Dorland registered the copyright for her Facebook letter. Larson Mem.
SJ, Ex. 7 [Doc. No. 189-7]. The copyrighted letter replaced the caption from the Facebook post
with the words: "Real Letter." Id.

### I. ASF Pulls *The Kindest* from Online Publication and Larson Re-writes the Letter in *The Kindest* at BBF's Request

After receiving Dorland's email, Norah Piehl, Deputy Director of BBF, promptly
contacted Larson and informed her of Dorland's plagiarism claims. Larson Mem. SJ, Ex. 19
[Doc. No. 190-9]. Larson told Piehl that Larson "remember[ed] that letter, and jotted down
phrases that [she] thought were compelling, though in the end [she] constructed the fictional
letter to suit the character of Rose." Id. Piehl asked Larson to "consider the possibility [of
making changes to the story] based on what [BBF] hear[s] from [its] lawyer about what
constitutes the threshold for plagiarism." Id.

A day later, Piehl emailed Larson stating that BBF's lawyer "suggest[ed] that Dawn may
have a valid claim"; in the interest of avoiding litigation, Piehl requested that Larson "completely
redraft the letter to avoid any resemblance in structure or language to the original; our lawyer
particularly said that paraphrases (such as the introductory paragraph of each letter) would need
to be avoided." Dorland Mem. SJ, Ex. DD [Doc. No. 182-4]. Larson agreed to the re-write. Id.
On or around June 13, 2018, Larson altered the structure of the letter in The Kindest and
removed almost all of the language that also appeared in the Dorland Letter. Larson Mem. SJ,
Appendix V [Doc. No. 193-5].

On June 19, 2018, ASF Co-Editor Rebecca Markovits emailed Dorland that "'The
Kindest' is now no longer up on [ASF's] website," and that Markovits "hope[d] this help[ed]
[Dorland] find some resolution and closure to your natural concerns." Larson Mem. SJ, Ex. 12
[Doc. No. 190-2]. In a separate email thread with Markovits, Larson consented to the

"sunset[ting]" of her piece on ASF's online platform; there is no evidence that The Kindest was removed from print circulation. Dorland Mem. SJ, Ex. EE [Doc. No. 182-5]. Larson still received the full $300 due to her under the ASF contract. Dorland Resp. SUMF ¶ 22 [Doc. No. 195]; Larson Mem. SJ, Ex. 11 (ASF Contract) [Doc. No. 190-1].

### J. Dorland Seeks Further Relief from BBF and Contacts the Boston Globe

After Larson made the revisions requested by BBF, Dorland continued to contact BBF regarding The Kindest and Larson. Larson Mem. SJ, Ex. 20 [Doc. No. 190-10]. On June 18, 2018, Dorland wrote to Piehl to express her dismay that BBF was moving forward with printing the revised version of The Kindest. Id. Dorland stated that "I wouldn't have been at all surprised if BBF had found it repugnant to grant a writer who committed plagiarism such a wonderful platform. At the very least, with the legal issue neutralized, I would have expected the organization to acknowledge the remedies it took in order to proceed with the story." Id. At Dorland's request, Piehl invited Dorland to propose an acknowledgment, Larson Mem. SJ, Ex. 21 [Doc. No. 191-1], and Dorland suggested one which included the lines: "A section of the story was substantially revised because it bore a clear resemblance to the unpublished work and service of the writer Dawn Dorland, a living kidney donor. The Boston Book Festival, 1C1S, and the author Sonya Larson express their sincere regrets." Larson Mem. SJ, Ex. 22 [Doc. No. 191-2]. Dorland also asserted that The Kindest contained factual inaccuracies with respect to the process of kidney donation and would "discourage" organ donation. Id.

Sometime in mid-June 2018, Dorland also reached out to Graham Ambrose, a reporter at the Boston Globe, to discuss her dispute with Larson. Dorland Resp. SUMF ¶ 51 [Doc. No. 195].

### K. *Dorland's Attorney Sends Cease and Desist Letter to BBF and Dorland Writes to Larson's Employer*

On July 3, 2018, Dorland's California lawyer, Jeffrey Cohen, wrote to BBF, charging that Larson had committed copyright infringement in The Kindest and demanding that BBF cease "printing, copying, distribution, or other activities related to 'The Kindest' until this matter has been resolved." Dorland Resp. SUMF ¶ 47 [Doc. No. 195]; Larson Mem. SJ, Ex. 24 [Doc. No. 191-4]. Cohen demanded that BBF provide "an advance copy of the purportedly revised 'non-infringing' version of 'The Kindest,'" and threatened legal action if the draft was not satisfactory, writing:

> such action, if necessary, would no longer be for attribution, but will demand the full measure of penalties for statutory copyright infringement under 17 U.S.C. § 504(c), which as you likely are aware, could be as high as $150,000 under facts as those presented herein wherein BBF has admitted infringement and willfully proceeds in complete and intentional disregard of our client's rights….The shortness, and quite frankly the rudeness of your prior response to our client will not be considered favorably by the court.

Id.

On July 7, 2018, Dorland wrote to Eve Bridburg, the head of Larson's then-employer, GrubStreet, to file "a complaint of professional misconduct" against Larson. Larson Mem. SJ, Ex. 23 [Doc. No. 191-3]. In her email, Dorland raised her "claim that Sonya plagiarized my writing in her short story, The Kindest," complained that Larson had "physical[ly] ghost[ed]" Dorland at a conference, and called for Larson to be "suspended with or without pay." Id.

BBF's attorney sent Cohen a copy of the revised version of The Kindest on July 10, 2018. Dorland Resp. SUMF ¶ 49 [Doc. No. 195]. Dorland's attorneys responded that Dorland was dissatisfied with the revisions. Larson Mem. SJ, Ex. 25 ¶ 9 (Gregorio Aff.) [Doc. No. 191-5]. On or about July 23, Attorney Michael Hanna, who worked with Attorney Cohen, told James Gregorio, counsel for Larson, that Dorland wanted acknowledgment of her contribution to the

story with her name cited, information about how to donate a kidney, and $5,000. Id. at ¶ 11; Dorland Resp. SUMF ¶¶ 53-55 [Doc. No. 195].

Gregorio learned on July 23 that Dorland had contacted the Boston Globe. Larson Mem. SJ, Ex. 25 ¶ 10 (Gregorio Aff.) [Doc. No. 191-5]. The following day, Gregorio called Hanna to inform him that "there was no point discussing settlement if there was going to be a negative article in the [Boston] Globe." Id. at ¶ 11; Dorland Resp. SUMF ¶ 55 [Doc. No. 195]. Hanna responded, "If we get everything we want, we will give our full effort to kill the story." Larson Mem. SJ, Ex. 25 ¶ 11 (Gregorio Aff.) [Doc. No. 191-5].

### L.  Boston Globe Publishes a First Article

On July 26, 2018, The Boston Globe ran Ambrose's article, titled "Inspiration or plagiarism? Writing hackles raised in Boston dispute." Larson Mem. SJ, Ex. 30 [Doc. No. 191-10]. The article contained quotes from the Dorland Letter, the 2017 version of The Kindest Letter, and the 2016 version of The Kindest Letter. Id. Both Dorland and Larson are quoted in the article. Id. None of the quotes attributed to Dorland call Larson a "plagiarist" or otherwise use the term "plagiarism." Id.

### M.  BBF Prints The Kindest but Cancels 1C1S

On August 6, 2018, BBF printed 30,000 copies of the revised version of The Kindest. Dorland Mem. SJ, Ex. GG [Doc. No. 182-7]; Dorland Resp. SUMF ¶ 58 [Doc. No. 195]. On August 13, 2018, BBF's Executive Director, Deborah Porter, informed Larson that 1C1S was being cancelled as a result of the ongoing dispute with Dorland. Dorland Mem. SJ, Ex. GG [Doc. No. 182-7]. Porter suggested that Larson could be liable for BBF's costs in printing The Kindest (approximately $10,000), but ultimately Larson was not required to compensate BBF for its costs. Dorland Mem. SJ, Ex. HH [Doc. No. 182-8].

### N.  The Boston Globe Publishes a Second Article

13

After 1C1S was cancelled, the Boston Globe ran a second story on Larson and Dorland's dispute. Larson Mem. SJ, Ex. 33 [Doc. No. 192-3]. In that piece, the Boston Globe included direct quotes from several versions of the letter, including the 2016 Letter from the first Audible recording. Id.

### O. Further Events After the Lawsuit Was Filed

After discovery had commenced in this action, Dorland contacted a writer at The New York Times to further publicize her dispute with Larson. Dorland. Resp. SUMF ¶ 65 [Doc. No. 195]. The New York Times Magazine published a long-form article titled, "Who is the Bad Art Friend?" on October 10, 2021. Id. The article included Larson's early texts that had come out during discovery, as well as quotes from various versions of The Kindest and interviews with both women. Larson Mem. SJ, Ex. 36 [Doc. No. 192-6].

Larson remained employed at Grubstreet for three years after Dorland first reached out to the organization but was terminated after the New York Times story was published. Dorland Mem. SJ, Ex. G [Doc. No. 194-7] (GrubStreet Statement, Oct. 29, 2021, attributing change in organization's employment decisions to "certain documents relating to th[is] lawsuit that recently came to light").

### III. Procedural Background

### A. Larson's Complaint

Larson initiated this action on January 30, 2019. Compl. [Doc. No. 1]. Larson's operative Second Amended Complaint [Doc. No. 91] brings claims against Dorland for Intentional Interference with Larson's Advantageous Business Relationship with ASF (Count I), Intentional

Interference with Larson's Advantageous Business Relationship with BBF (Count II), Defamation (Count VII), and seeks a Declaratory Judgment (Count VIII) of noninfringement.[3]

### B. Dorland's Counterclaims

Dorland's <u>Answer to Second Amended Complaint and Restated Counterclaim</u> [Doc. No. 96] asserts claims against Larson for Copyright Infringement (Count I), Declaratory Relief (Count II), and Injunctive Relief under Copyright Law (Count III).[4]

### C. Motions Before the Court

Dorland's pending <u>Motion for Summary Judgment</u> [Doc. No. 180] requests entry of judgment on her remaining Counts against Larson, as well as on Larson's remaining Counts against Dorland.[5] Larson's pending <u>Cross Motion for Partial Summary Judgment</u> [Doc. No. 187] requests entry of judgment in her favor on Counts I, II, and VII of her Second Amended Complaint, and Counts I and II of Dorland's Counterclaim.

## IV. Discussion

### A. Copyright Infringement

Dorland asserts that "the Brilliance Audio version, the ASF Web Version, the hard copy version published by ASF, any and all versions published by Audible.com, the version printed by the BBF, the version published by Welcome to the Neighborhood, and any other versions of <u>The Kindest</u>" infringe upon Dorland's copyright in her 2015 Letter. Dorland Counterclaim ¶ 176

---

[3] Larson also sued Attorney Jeffrey Cohen and the Cohen Business Law Group, LLC. <u>Id.</u> These two Defendants were subsequently dismissed by stipulation. Joint Stipulation [Doc. No. 178].

[4] Dorland also sued for Intentional Infliction of Emotional Distress (Count IV), <u>id.</u>, but the court dismissed this claim. Mem. & Order [Doc. No. 99].

[5] Dorland also filed a <u>Motion to Strike Larson's Response to Dorland's Statement of Material Facts</u> [Doc. No. 199] as untimely and prejudicial. The court denied in part and granted in part Dorland's motion. Elec. Order [Doc. No. 209].

[Doc. No. 96].[6] Larson claims that she owns the copyright to The Kindest, and that the 2018

Letter does not infringe on Dorland's letter because it is not substantially similar to the Dorland

Letter. Larson Mem. SJ 39 [Doc. No. 189]. She further asserts that all versions of the letter in

The Kindest are protected by the fair use defense. Id. at 24.

        1.      Substantially Similar

In order to prove copyright infringement, a plaintiff must show "(1) ownership of a valid

copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns,

Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). The second prong is a two-part inquiry:

first, the plaintiff must show that the defendant actually copied the original work. Second, the

plaintiff must show that "the copying of the copyrighted material was so extensive that it

rendered the infringing and copyrighted works 'substantially similar.'" Segrets, Inc. v. Gillman

Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000). The parties do not dispute that Dorland owns the

copyright to her 2015 Letter, or that Larson actually copied that letter. Dorland Resp. SUMF

¶¶ 19, 48 [Doc. No. 195]; Larson Resp. SUMF ¶¶ 6, 28 [Doc. No. 197]. The only remaining

question as to infringement is that of substantial similarity between the Dorland Letter and each

of the three versions of The Kindest Letter.

"Substantial similarity is an elusive concept, not subject to precise definition." Concrete

Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 606 (1st Cir. 1988). The inquiry is a

"sliding scale": If there are many ways to express a particular idea, then the burden of proof on

---

[6] Dorland submitted copies of only three versions of The Kindest: (1) the 2016 version published
by Brilliance Audio, the Audible.com subsidiary ("the 2016 Letter"), Dorland Mem. SJ, Ex. VV.
[Doc. No. 182-22]; (2) the 2017 version published by ASF ("the 2017 Letter"), Dorland Mem.
SJ, Ex. WW [Doc. No. 182-23]; and (3) the 2018 copyrighted version of The Kindest ("the 2018
Letter"), Dorland Mem. SJ, Ex. XX [Doc. No. 182-24]. Therefore, the court considers Dorland's
infringement claims only as to those three versions of The Kindest.

the plaintiff to show substantial similarity is lighter. Id. at 606-07. Here, there are many ways to

write a letter, even one dealing specifically with kidney donations. Larson Mem. SJ, Ex. 8 [Doc.

No. 189-8] (examples of sample letters from organ donors/family members of organ donors to

recipients); Id., Ex. 1 ¶ 7 (Larson Aff.) [Doc. No. 189-1].

However, "[n]o infringement claim lies if the similarity between two works rests

necessarily on non-copyrightable aspects of the original—for example, 'the underlying ideas, or

expressions that are not original with the plaintiff.'" TMTV, Corp. v. Mass. Prods., Inc., 645

F.3d 464, 470 (1st Cir. 2011) (internal citation omitted). "[I]t is only when 'the points of

dissimilarity not only exceed the points of similarity, but indicate that the remaining points of

similarity are (within the context of plaintiff's work) of minimal importance either quantitatively

or qualitatively, [that] no infringement results.'" Segrets, Inc., 207 F.3d at 66. "'The test is

whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person

would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression

by taking material of substance and value.'" Id. at 62. "While summary judgment for a plaintiff

on these issues is unusual," it may be warranted based on the factual record. Id.; accord T-Peg,

Inc. v. Vt. Timber Works, Inc., 459 F.3d 97, 112 (1st Cir. 2006).

Because the three versions of The Kindest Letter resemble the Dorland Letter to different

degrees, the court considers each of the three versions in turn.[7]

---

[7] Contrary to Dorland's assertion, Dorland Mem. SJ 9 [Doc. No. 184], this court may not assume
that a later-edited version of a piece of writing is "infected with infringement" merely on the
basis that a previous version bore a substantial similarity to copyrighted material. Were that the
case, then authors would always be legally beholden to their first drafts, regardless of the nature
of any edits undertaken in subsequent iterations.

**The 2016 Brilliance Audio Letter**.[8]  As Larson concedes, the undisputed evidence mandates a conclusion that the 2016 Letter is substantially similar to the Dorland Letter. The Dorland Letter is approximately 381 words long, Dorland Mem. SJ, Ex. C [Doc. No. 181-3]; of those 381 words, the 2016 Letter copies verbatim approximately 100, and closely paraphrases approximately 50 more, Larson Mem. SJ, Appendix I [Doc. No. 193-1]. Many of these verbatim or near-verbatim lines gave the Dorland Letter its particular character, including: "My gift…trails no strings"; "I [focused/channeled] [a majority of] my [mental] energ[y/ies] into imagining and celebrating you"; "I accept any level of involvement,…even if it is none"; "To me the suffering of strangers is just as real"; and "I [wasn't given/didn't have] the opportunity to form secure attachments with my family of origin." Id. The 2016 Letter also follows an identical structure to the Dorland Letter: a paragraph introducing the donor, including information on race, age, and gender; a paragraph explaining how the donor discovered the need for kidney donation; a paragraph explaining the donor's traumatic childhood; a paragraph expressing the donor's focus on the future recipient; a paragraph wishing the recipient health and happiness; and a concluding paragraph expressing a desire to meet. Id. Based on the documents before the court, the 2016 Letter took "material of substance and value" from the Dorland Letter in such a quantity and in such a manner that the points of similarity outweigh the points of dissimilarity. See Segrets, Inc., 207 F.3d at 62, 66.

---

[8] Larson maintains that the 2016 Letter was published by accident and without her consent. Larson Mem SJ. at 6 [Doc. No. 189]. Larson appears to suggest—but never explicitly argues— that the 2016 Letter cannot be subject to a copyright infringement claim. Id. at 28. But Larson offers no evidence to support her assertion that the release of the story on August 3, 2016, occurred without her consent or to suggest that she had not given Plympton the right to publish the 2016 version of the story. Larson Mem. SJ, Ex. 9 [Doc. No. 189-9]. As such, this court will consider Dorland's copyright infringement claims against the Brilliance version of The Kindest.

**The 2017 American Short Fiction Letter**. The 2017 Letter does not compel either a finding of substantial similarity or a finding of no infringement. The 2017 Letter contains less verbatim language than the 2016 Letter. Larson Mem. SJ, Appendix III [Doc. No. 193-3]. But it still closely paraphrases the Dorland Letter, including the notable line "imagining and celebrating you," where "celebrating" has been altered to "rejoicing in." Id. The 2017 Letter also retains the identical organizational structure of the Dorland Letter. Id. However, the similarities between the 2017 Letter and the Dorland Letter are not so striking that no reasonable juror could conclude that the two letters are meaningfully different. Id.

**The 2018 Boston Book Festival Letter**. The 2018 Letter is very different from the 2016 Letter. Unlike the 2016 Letter, the 2018 Letter contains almost no verbatim or closely paraphrased language from the Dorland Letter: the key phrases identified above are all entirely absent from the 2018 Letter. Larson Mem. SJ, Appendix V [Doc. No. 193-5]. The organization and tone of the 2018 Letter are also notably different from the Dorland Letter: Among other changes, the 2018 Letter contains a new introductory paragraph and a substantially revised concluding paragraph. Id. The 2018 Letter does incorporate the one-word signature line, "Kindly," that was also present in the Dorland Letter (but absent in the 2016 and 2017 Letters). Id. In sum, the "points of dissimilarity" between the substantially revised 2018 Letter and the Dorland Letter exceed any remaining points of similarity; further, those remaining similarities are either "of minimal importance" to the Dorland Letter or are not copyrightable expressions (e.g., the general concept of a letter written to an organ recipient, and the one-word signature line). See Segrets, Inc., 207 F.3d at 66. As a result, the court finds that the 2018 Letter is not substantially similar to the Dorland Letter, and therefore does not infringe upon the Dorland Letter.

19

2. Fair Use Defense

Larson contends that, even if the Larson Letters are found to be substantially similar to the Dorland Letter, any infringement constituted permissible fair use. The fair use defense is an affirmative defense to copyright infringement; as such, Larson bears the burden of proof at summary judgment.

"The fair use doctrine 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 143 S. Ct. 1258, 1274 (2023) (quoting Stewart v. Abend, 495 U.S. 207, 236 (1990)). The fair-use doctrine is a mixed question of law and fact. Google LLC v. Oracle Am., Inc., 141 S. Ct. 1183, 1199 (2021). "The task [of applying the fair use doctrine] is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994). The Copyright Act directs the court to determine whether use of the work "for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research" is non-infringing fair use by considering factors including: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. §§ 107(1)-(4). The factors are to be considered together, not "treated in isolation, one from another." Campbell, 510 U.S. at 578.

a. Character of the Use

The first factor of the fair use defense requires the court to consider "whether the new work merely 'supersede[s] the objects' of the original creation … ('supplanting' the original), or instead adds something new, with a further purpose or a different character." Campbell, 510 U.S. at 579. Put another way, the first factor contemplates "whether and to what extent the new work is 'transformative.'" Id.

As a preliminary matter, the parties disagree upon the proper frame of reference for the transformative use inquiry. Larson would have the court focus on whether The Kindest, taken in its entirety as a short story, serves a distinct purpose to Dorland's original Facebook post. Larson Mem. SJ 25-26 [Doc. No. 189]. Dorland argues that the letter as it exists within The Kindest is put to the exact same use as Dorland's original letter: "that is, a personal letter from the organ donor to an organ recipient, for the purpose of sharing the donor's motivations and desire to connect in the shared experience with the recipient of the organ." Dorland Mem. SJ 14 [Doc. No. 184].

The law is on Larson's side. In Andy Warhol Foundation, the Supreme Court took its analysis down to the very end of the contextual chain, starting with the medium of the work ("portraits"), but ending with the broader framework in which the work ultimately appeared ("magazine stories about Prince"). Andy Warhol Found., 143 S. Ct. at 1273. Applying the Andy Warhol Foundation framework to the facts of this case, the short story itself is the broader framework in which the allegedly infringing material—the letter—appears. Thus, the court must conduct its analysis in line with that final contextual reference point.

"The same copying may be fair when used for one purpose but not another." Id. at 1277. Thus, the transformative use inquiry "is a matter of degree, and the degree of difference must be

21

weighed against other considerations, like commercialism. Although new expression may be relevant to whether a copying use has a sufficiently distinct purpose or character, it is not, without more, dispositive of the first factor." Id. at 1273.

"[A]n overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works." Id. at 1275. To distinguish itself from a derivative use, then, a transformative use must "'serve a manifestly different purpose from the [work] itself.'" Id. at 1274. In other words, where the allegedly infringing work exists "orthogonal[ly]" to the original, the first factor is satisfied. Id. at 1281. That is precisely the case here.

The court begins with the Dorland Letter's purpose. As Dorland explains, its purpose was to inform the kidney recipient at the end of the chain, as well as Dorland's friends and family members, about her motivations for becoming a living kidney donor, and to express her emotions surrounding her own donation and her good wishes for the recipient. Dorland Mem. SJ, Ex. PP 128-138 (Dorland Depo.) [Doc. No. 182-16]. More broadly, the Dorland Letter served as an update in her broader social media documentation of her kidney donation, which she hoped would raise awareness about living kidney donation. See id., Exs. A, B [Doc Nos. 181-1; 181-2].

Larson contends that The Kindest made transformative use of the Dorland Letter by "using the letter in 'The Kindest' to introduce the character, Rose[,] to the character, Chuntao" in a "fictitious" story. Larson Mem. SJ 25-26 [Doc. No. 189]. The letter was used not just to introduce Rose, but to starkly contrast an altruistic kidney donor's view of her own actions with the view a recipient may have of the same actions. Id., Appendices I-V [Doc Nos. 193-1–5]. The story, read in its entirety, does not mirror the tone of Dorland's letter, nor does the story's tone seek to build on Dorland's thoughts, emotions, and feelings about altruistic kidney donation. Id;

22

Id., Ex. 22 [Doc. No. 191-2] (Dorland description of The Kindest as "mock[ing] the motivations of an altruistic donor"). Moreover, as Dorland herself pointed out to BBF, the story does not seek to provide factually accurate information about the process of living kidney donation. Id., Ex. 22 [Doc. No. 191-2]. In short, these two pieces are at opposite ends of the spectrum of writing about kidney donation.

Indeed, it would be difficult to read The Kindest as anything other than a criticism of an altruistic donor's choice to reach out to a kidney recipient. Chuntao, The Kindest's narrator, seems to harbor resentment and pity—bordering on contempt—for her donor's act of charity. The undisputed evidence regarding the context of Larson's writing and drafting process makes it clear that this criticism was Larson's focus in The Kindest: Larson's conversations with friends and fellow writers underscore the critical attitude she took towards Dorland's public discussion of her kidney donation, and towards Dorland herself. Dorland Mem. SJ, Ex. R [Doc. No. 181-18]; Id., Ex. UU [Doc. No. 182-21].

This context is important, because criticism (and its close cousin, parody[9]) do not "supersede the objects of, or supplant" an original work in the same way that more flattering follow-on works might do. See Andy Warhol Found., 143 S. Ct. at 1274. That is because "the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their

_____

[9] Dorland contends that the court should not consider whether The Kindest is parody or criticism because Larson did not expressly raise these arguments in her brief. In the alternative, Dorland argues that The Kindest is not parody or criticism because its mockery of Dorland was known only to a limited audience. Dorland Mem. SJ 14-15 [Doc. No. 184]. But Dorland's argument fails to reckon with the rationale behind these exceptions—which is that parody and criticism of an original work exists orthogonally to that original work. It does not tell the same story, or even speak to the same audience. Campbell, 510 U.S. at 592.

own productions removes such uses from the very notion of a potential licensing market."
Campbell, 510 U.S. at 592.

Relatedly, that an allegedly infringing work is critical of an original work is a strong indication that the two artists had diverging motivations in creating their respective pieces, a fact that also weighs in favor of transformative use. See Núñez v. Caribbean Intern. News Corp., 235 F.3d 18 (1st Cir. 2000) ("[W]hat is important here is that the plaintiffs' photographs were originally intended to appear in modeling portfolios, not in the newspaper; the former use, not the latter, motivated the creation of the work."). Larson used the short story as a medium for giving voice to her discomfort with the idea of a donor publicizing their donation. Dorland Mem. SJ, Ex. UU (text to Shari Bowen) [Doc. No. 182-21]. That motivation could not be further from Dorland's purpose in writing, posting, and sending the letter, which was to do exactly that which Larson condemns in her story: to seek connection with her kidney recipient, and to seek recognition from a broader community.

Finally, while "a finding that copying was not commercial in nature tips the scales in favor of fair use…the inverse is not necessarily true." Google, 141 S. Ct. at 1204; accord Andy Warhol Found., 143 S. Ct. at 1276 ("The commercial nature of the use is not dispositive."). Here, as in Google, the court finds that the entirely orthogonal purpose of The Kindest Letters as compared to the original Dorland Letter outweighs any potential unfairness from any commercial benefit Larson received from The Kindest's publication. See 141 S. Ct. at 1204.

b.   Nature of the Copyrighted Work

"The second statutory factor, 'the nature of the copyrighted work,' 17 U.S.C. § 107(2), requires us to consider two elements: (1) whether [the Dorland Letter is] factual or creative, and (2) whether [the Dorland Letter] ha[s] previously been published." Soc'y of Holy

24

Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 61 (1st Cir. 2012) (internal citations omitted). The parties dispute both elements.

The first element concerns "the extent to which it is a creative work enjoying broader copyright protection as opposed to a factual work requiring broader dissemination." Núñez, 235 F.3d at 23. Larson does not directly address this first element but refers to the Dorland Letter as the "factual letter." Larson Amended Complaint ¶ 10 [Doc. No. 91]. Dorland maintains that her letter contains key elements of creative expression. Dorland Mem. SJ 18-19 [Doc. No. 184]. The court finds that the Dorland Letter lies somewhere in a middle ground: while it used creative language to express Dorland's ideas, emotions and feelings, the Letter was not an artistic representation but rather a communication meant to convey factual information about non-directed kidney donation and Dorland's own actions. "Given the difficulty of characterizing the 'nature'" of the Dorland Letter, "the impact of [its] creativity on the fair use finding is neutral." See Núñez, 235 F.3d at 23.

The second element derives from the copyright owner's "'right to control the first public distribution' of [her] work," which "implicates not only [her] personal interest in creative control but [her] property interest in exploitation of prepublication rights, which are valuable in themselves and serve as a valuable adjunct to publicity and marketing." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 555 (1985). Larson argues that because Dorland shared the letter with, among others, the UCLA transplant team, the kidney recipient, and a subset of her Facebook followers, the Dorland Letter was published. Larson Mem. SJ 27-28 [Doc. No. 189]. Dorland argues that because she posted the letter to a private Facebook group, it was not published. Dorland Mem. SJ 15 [Doc. No. 184].

Here, the court finds that the Dorland Letter was published for the purposes of the copyright inquiry. The First Circuit has recognized that the Copyright Act does not necessarily require an author to publish a work in a traditional media format (e.g., a newspaper or a book) for that author to have capitalized on their right of first publication. See Núñez, 235 F.3d at 24 ("Although these photographs had not before been published in a book or public portfolio, they were hardly confidential or secret, as was the manuscript in Harper & Row prior to its serial publication."). Such is the case with the Dorland letter. Dozens of people viewed the letter on Facebook. Dorland Mem. SJ, Ex. C [Doc. No. 181-3]. Dorland herself reported that she sent the letter to the transplant team at UCLA where it was read and "shared widely," id., without Dorland once raising an objection to its circulation, or "s[eeking] to control further dissemination during [its] limited distribution." See Núñez, 235 F.3d at 24. Elsewhere, Dorland encouraged the Facebook community more broadly to "share" her kidney post; although that directive was not specific to her letter, her actions suggest that she was not intent on keeping it secret. Dorland Resp. SUMF ¶ 14 [Doc. No. 195]. These facts indicate that the Dorland Letter was "hardly confidential or secret," and may fairly be treated as "published" under the law. See Núñez, 235 F.3d at 24.

      c.   Amount and Substantiality of Use

The third factor considers the amount and substantiality of the use of the copyrighted material as compared to the copyrighted material as whole. "Both direct quotes and close paraphrases count as being 'used.'" Wright v. Warner Books, Inc., 953 F.2d 731, 738 (2d Cir. 1991). The court also considers whether the infringing work "is structured around the quoted excerpts which serve as its dramatic focal points." Harper & Row Publishers, Inc., 471 U.S. at 566. Contrary to Larson's arguments, Larson Mem. SJ 28 [Doc. No. 189], the court may not

consider the proportion of copyrighted material to uncopyrighted material used in the allegedly infringing work under this factor. Harper & Row Publishers, Inc., 471 U.S. at 566 ("[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate."). Because Larson used different amounts of the Dorland Letter in the three versions of The Kindest Letter, the court considers them separately.

**The 2016 Letter**. Larson copied more of the Dorland Letter than necessary in the 2016 Letter. Indeed, she copied so much of the letter that she introduced inaccuracies into her own story, referencing a "paired exchange" when The Kindest did not involve that medical procedure. Dorland Mem. SJ, Ex. RR 30:13-19 (Larson Depo.) [Doc. No. 182-18]. The 2016 Letter includes the verbatim portion of the Dorland Letter that discusses Dorland's childhood trauma—an aspect of Rose's character that is never referenced again throughout the story. Id. at 30:19-26. Additionally, the 2016 Letter includes a near-verbatim repetition of the line: "I channeled my energy into imagining and celebrating YOU." In The Kindest, this line is a focal point ("underscored three times") that drives Chuntao's reaction to receiving the letter. Larson Mem. SJ, Appendix I [Doc. 193-1]. Therefore, as to the 2016 Letter, the third factor weighs against a finding of fair use.

**The 2017 Letter.** Viewed in the light most favorable to Dorland (the non-moving party), the 2017 Letter also borrows more than necessary from the Dorland Letter. While Larson edited the letter to avoid most verbatim copying (such as the "trails no strings" language), the 2017 Letter still contains many "close paraphrases" and several key verbatim or near-verbatim passages from the Dorland Letter. Like the 2016 Letter, the 2017 Letter contains a near-verbatim recitation of the line: "I channeled my mental energy into imagining and celebrating YOU." Larson Mem. SJ, Appendix III [Doc. No. 193-3]. It also contains the phrase "paired exchange"

from the Dorland Letter, even though the kidney donation described in <u>The Kindest</u> was not a "paired exchange." <u>Id.</u> The court finds that as to the 2017 Letter, the third factor weighs against a finding of fair use.

**The 2018 Letter**. As noted above, the 2018 Letter contains no verbatim or closely paraphrased language from the Dorland Letter except the one-word signature line, "Kindly." As to the 2018 Letter, this factor weighs in favor of a finding of fair use.

d.   Effect on Market Value of Original Work

The market-effects factor is the "most important" one. <u>Harper & Row Publishers, Inc.</u>, 471 U.S. at 566. It is concerned with whether an allegedly infringing work will lead to "[economic] losses [that] normally conflict with a copyright's basic objective: providing authors with exclusive rights that will spur creative expression." <u>Google LLC</u>, 141 S. Ct. at 1206.

In this way, the fourth factor (like the first factor) asks whether the alleged infringer transformed the source material in such a way that demand for the new work can exist alongside demand for the original. Here, the answer to that question is 'yes.' As discussed, <u>The Kindest</u> is highly critical of the subject matter in the Dorland Letter. And just as a new parodic use may well "suppress demand for the original by its critical effect" without "usurp[ing] demand by its substitutive effect," <u>see</u> <u>Campbell</u>, 510 U.S. at 598, a critical use may serve a similar role.[10]

Ironically, Larson's short story has, if anything, increased demand for Dorland's original letter and her own perspective on kidney donation. Larson Mem. SJ, Ex. 30 (Boston Globe

---

[10] Dorland asserts that there are not sufficient facts in the record for Larson to carry her burden on this factor. Dorland Mem. SJ 20 [Doc. No. 184]. While it is true that Larson has not, for example, offered expert testimony on the fair market value of a nonfiction letter, she has introduced evidence of Dorland's ability to publicize the letter, discussed above, and of Dorland's inaction with respect to creating derivative works of the letter since she wrote it in 2015. Dorland Resp. SUMF ¶¶ 70, 73 [Doc. No. 195].

article) [Doc. No. 191-10]; Id., Ex. 36 (New York Times article) [Doc. No. 192-6]; see Núñez, 235 F.3d at 25 (fourth factor favored fair use where "the only discernible effect of the publication…was to increase demand for the [original]"). As Larson noted in her briefing, "Dorland can still tell about her donation, in whatever genre or medium she would like," Larson Mem. SJ 26 [Doc. No. 189]—and so she has. Larson Mem. SJ, Ex. 30 [Doc. No. 191-10; Id., Ex. 36 [Doc. No. 192-6]. Therefore, the court finds that the fourth factor weighs in favor of the fair use defense.

Finally, Dorland argues that Larson's "bad faith" personal comments about Dorland in group chats with friends and other writers foreclose her invocation of the fair use defense. Dorland Mem. SJ 16-17 [Doc. No. 184]. The Supreme Court and the First Circuit have expressed skepticism that "bad faith has much relevance to the fair use analysis." Monsarrat v. Newman, 28 F.4th 314, 323 n.3 (1st Cir. 2022); Google LLC, 141 S. Ct. at 1204 ("As for bad faith, our decision in Campbell expressed some skepticism about whether bad faith has any role in a fair use analysis. We find this skepticism justifiable, as '[c]opyright is not a privilege reserved for the well-behaved'" (internal citation omitted).). Even if bad faith were significant, copyright law is not concerned with a person's generally good or bad character—but rather whether that person obtained copyrighted material using "egregious" and inappropriate means. See Monsarrat, 28 F.4th at 323 n.3. Here, Dorland voluntarily shared the letter with Larson (and, indeed, with many others). That Larson proceeded to privately ridicule Dorland over the letter's contents may change Dorland's feelings about choosing to share personal information with Larson—but it does not change Larson's entitlement to a legal defense.

In sum, because three of the four factors, including the "most important" fourth factor, weigh in favor of the defense, the court finds that the at-issue versions of The Kindest are protected by fair use.

### B. Defamation

In her Second Amended Complaint, Larson alleges that "Dorland contacted the ASF, the BBF, GrubStreet, Bread Loaf, the Boston Globe, Larson's writer's group, and in Dorland's own words, 'other writing conferences of similar repute,' spreading false and malicious claims of plagiarism against Larson." Amended Complaint ¶ 109 [Doc. No. 91]; Dorland Mem. SJ, Ex. SS 220:11-13 [Doc. No. 182-19]. In response, Dorland asserts that her statements were true, or in the alternative, were non-defamatory statements of opinion. Dorland Mem. SJ 22, 25 [Doc. No. 184].

To succeed on a claim of defamation under Massachusetts law, a plaintiff must show: (1) that "the defendant made a statement, concerning the plaintiff, to a third party"; (2) that the statement was capable of damaging "the plaintiff's reputation in the community"; (3) that "[t]he defendant was at fault in making the statement"; and (4) that "[t]he statement either caused the plaintiff economic loss…or is actionable without proof of economic loss." Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (cleaned up); see also Ravnikar v. Bogojavlensky, 438 Mass. 627, 629, 782 N.E.2d 508 (2003) (same).[11] For several reasons, Larson's defamation claim fails as to all contested communications.

---

[11] The court agrees with Larson that falsely accusing a writer of plagiarism to journals, magazines, writing fellowships, and other writers is the kind of defamatory statement that would be actionable without a showing of loss. See Larson Mem. SJ 21-22 [Doc. No. 189].

First, Larson has failed to introduce any evidence of Dorland's specific communications with many of the individuals and entities on Larson's extensive list of allegedly defamatory statements. Of note, Larson does not point to any communications between Dorland and the Boston Globe outside of the two articles ultimately published by the Globe—and Dorland does not explicitly accuse Larson of "plagiarism" or call her a "plagiarist" in either one. Larson Mem. SJ, Ex. 30 [Doc. No. 191-10]; Id., Ex. 33 [Doc. No. 192-2]. Moreover, both articles include excerpts of the Dorland Letter and various versions of The Kindest Letter, in order to highlight the relevant points of similarity. Id. Dorland's statements to the Globe, as reflected in the two final articles, express her reaction to reading The Kindest and seeing language "that bore striking similarities to her own." Larson Mem. SJ, Ex. 30 [Doc. 191-10] (quoting from The Boston Globe); see Croce v. Sanders, 843 Fed. Appx. 710, 713 (6th Cir. 2021) (no defamation where defendant contacted a New York Times journalist after "report[ing] his [plagiarism] concerns to the respective journals" where the material was published and receiving "unsatisfactory" responses). Therefore, Larson has failed to meet her burden on summary judgment that Dorland's allegations of plagiarism as to the Boston Globe rise to the level of defamation.

Second, a statement of opinion cannot be defamatory "where the speaker communicates the non-defamatory facts that undergird his opinion." Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015). That is exactly what Dorland did in her communications with ASF, BBF, and literary agent Samantha Shea.[12] Dorland's email to Shea included the text of the letter in the body of the email, as well as an extensive discussion of the reasons Dorland thought Larson may have copied Dorland's original letter. Dorland Mem. SJ, Ex. Y [Doc. 181-25] (email to Samantha Shea). And

---

[12] Larson concedes that this reasoning would protect any of Dorland's other statements where Dorland also provided excerpts or a copy of her letter.

in her emails to ASF and BBF, Dorland stated that she had attached a copy of her 2015 Letter, inviting the recipients to see "if [they] agree[d]" with Dorland's assessment that The Kindest plagiarized Dorland's writing. Dorland Mem. SJ, Ex. Z (ASF email) [Doc. No.181-26]; Dorland Mem. SJ, Ex. BB (BBF email) [Doc. No. 182-2]. Given that Dorland provided the factual context, and the piece of writing she claimed was the source material for Larson's alleged plagiarism, Dorland sufficiently supported her opinion with the relevant non-defamatory information.

Dorland similarly provided additional information in her communications with the Dear Sugars podcast, the former Breadloaf director Michael Collier, GrubStreet, and reporter Kat Rosenfield. Dorland Mem. SJ, Ex II (email to Dear Sugars podcast) [Doc. No. 182-9]; Id., Ex. JJ (Twitter DM to Kat Rosenfield) [Doc. 182-10]; Larson Mem. SJ, Ex. 18 (email to former Breadloaf director) [Doc. 190-8]; In each message, Dorland included links to one or both of the Boston Globe articles, which, as discussed, provide context for the dispute as well as direct quotes from the Dorland Letter and various versions of The Kindest Letters. See Larson Mem. SJ, Ex. 30 [Doc. No. 191-10]; Id., Ex. 33 [Doc. No. 192-2].

Third, truth is an absolute defense to defamation. Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 1998). Under Massachusetts common law, statements that are "substantially true," but which may contain "minor inaccurac[ies]," are also considered non-defamatory. Reilly v. Associated Press, 59 Mass. App. Ct. 764, 770 (2003). The question is therefore whether Dorland's statements that Larson plagiarized her letter are substantially true.

Black's Law Dictionary defines "plagiarize" as "[t]o take phrases, sentences, or ideas from someone else's work and use them in one's own work without attribution, as if they were

one's own; to use the ideas and expressions of someone else without giving due credit." Black's Law Dictionary (10th ed. 2014). Based on the undisputed facts, this is exactly what Larson did in the 2016 Letter and at least arguably did in the 2017 Letter.[13] Many of Dorland's particularly unique lines, as well as the overall structure of the letter, remain the same across these two letters.

But the court need not independently compare documents to reach this conclusion. Larson herself admitted that she used Dorland's words in the original letter: in an email sent to an Audible representative, Larson stated that the letter in The Kindest "includes a couple of sentences that I'd excerpted from a real-life letter." Dorland Mem. SJ, Ex. O [Doc. No. 181-15]. Larson was more direct with her friends, texting: "I feel nervous about sending [The Kindest] out b/c it literally has sentences that I verbatim grabbed from Dawn's letter on FB." Id., Ex. RR 39:21-40:7 (Larson Depo.) [Doc. No. 182-18]; Id., Ex. J (Larson Text) [Doc. No. 181-10]. It is also clear that some of these verbatim sentences are not remotely Larson's own "ideas or expressions"; Larson admitted that even after publishing two versions of The Kindest including the phrase "paired exchange," she did not know what it meant, stating that "th[e] phrase is from Dorland's letter." Id., Ex. RR 30:13-19 (Larson Depo.) [Doc. No. 182-18].

While Larson may not have credited Dorland's "ideas and expressions" because Larson wanted to take credit for artistic aspects, as Dorland implies, it seems equally likely that Larson

---

[13] In contrast, the 2018 Letter substantially altered the text and removed any direct quotes or close paraphrases of the Dorland Letter. Dorland Resp. Larson SUMF ¶¶ 22, 24, 34, 37, 38, 51 [Doc. No. 195]. But each of the allegedly defamatory communications Larson discusses in her Second Amended Complaint and in her summary judgment papers occurred prior to the publication of the 2018 Letter. Therefore, during the period before the court in which Dorland was accusing Larson of plagiarism (summer 2017 through summer 2018), the publicly available versions of The Kindest included language taken verbatim from the Dorland Letter. Id.

did not mention Dorland initially because of the disparaging nature of the short story. And while Dorland may have communicated that she wanted credit for the ideas, it seems equally likely that she was very upset at the criticism. Regardless, it is undisputed that Larson did not credit Dorland, which means that Larson's use of Dorland's "ideas and expressions" in the 2016 and 2017 Letters satisfies the definition of plagiarism.

Finally, Larson complains that Dorland's communication to Breadloaf was defamatory because it incorrectly implied that Larson had used The Kindest in her 2017 Fellowship application when she had not done so. Larson Mem. SJ 23 [Doc. No. 189]. That misstates the nature of Dorland's communication with Breadloaf, which—while intrusive and unnecessary— never asserted or implied that The Kindest had been included in the application materials. Dorland Mem. SJ, Ex. CC [Doc. No. 182-3]. Further, as discussed above, it was not defamatory for Dorland to assert that Larson had used Dorland's letter in the first versions of her story without attribution.

For these reasons, the court finds that Dorland's statements accusing Larson of plagiarism as to the 2016 and 2017 Letters are non-defamatory.

### C.  Intentional Interference with Advantageous Business Relationships

Larson claims that Dorland and her attorneys, the Cohen Law Group, tortiously interfered with Larson's business relationships with ASF and BBF. She alleges that "Dorland and her agents…intentionally utilized aggressive and coercive language…in order to cause damage to Larson." Larson Amended Complaint ¶ 72 [Doc. No. 91]. In response, Dorland contends that she was appropriately protecting her legal interest in her own intellectual property. Dorland Mem. SJ 29-30 [Doc. No. 184].

To succeed on a claim of tortious interference with business relations, a plaintiff must show: (1) "a known advantageous relationship"; (2) "deliberate interference"; (3) "improper []

34

motive or means"; and (4) "resulting economic harm." Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 43 (1st Cir. 2011). To reiterate: A plaintiff cannot recover "where [it] ha[s] failed to show that [it] ha[s] suffered any pecuniary loss as a result of the defendant's actions." Hamann v. Carpenter, 937 F.3d 86, 93 (1st Cir. 2019).

Larson has failed to introduce any evidence of pecuniary loss due to Dorland's or her attorneys' allegedly tortious interference with the relationships between Larson and ASF/BBF. Larson received the full $300 payment on her contract with ASF. Larson Mem. SJ, Ex. 11 [Doc. No. 190-1]; Dorland Resp. SUMF ¶ 22 [Doc. No. 195]. There is no evidence that ASF pulled the Summer 2017 short story volume from print publication, which included The Kindest. Even if that were not the case, the option of online publication was not initially part of Larson's contract with ASF. Larson Mem. SJ, Ex. 11 [Doc. No. 190-1]; Dorland Mem. SJ, Ex. X [Doc. No. 181-24]. And Larson has introduced no evidence that she was subsequently entitled to an extended period of online exposure that was cut short by ASF's decision to take the piece down—a decision to which Larson herself consented, stating to Markovits: "Go ahead and sunset my piece—you can remove it now, if you'd like." Dorland Mem. SJ, Ex. EE [Doc. No. 182-5].

In the same vein, there is no evidence that Larson suffered an economic loss because of BBF's decision to cancel 1C1S. To start, Larson's contract with BBF did not include any payment to her for the use of The Kindest. Larson Mem. SJ, Ex. 16 [Doc. No. 190-6]. Perhaps in recognition of this fact, Larson alleges that the cancellation of 1C1S caused her to lose out on opportunities that "would likely have advanced her career and provided her with a reasonable expectancy of future professional and/or economic benefit." Larson Amended Complaint ¶ 76 [Doc. No. 91]; Larson Mem. SJ, Ex. 1 ¶¶ 12-13 (Larson Aff.) [Doc. No. 189-1]. But Larson provides no evidence of "speaking engagements and print, television and radio interviews" that

were rescinded after 1C1S was cancelled, <u>see</u> Larson Amended Complaint ¶ 76 [Doc. No. 91], or even of the specific opportunities—and payments for those opportunities—that "previous One City/One Story winners received." <u>Id.</u>

For these reasons, Larson has failed to satisfy the fourth element of her tortious interference claim as to both ASF and BBF.

## V.    Conclusion

For the reasons stated herein, as to Counts I, II, and VII of Larson's Second Amended Complaint, Dorland's Motion for Summary Judgment is GRANTED and Larson's Cross-Motion for Summary Judgment is DENIED. Dorland's Motion for Summary Judgment is DENIED as to the copyright claims (Count VIII of Larson's Second Amended Complaint and Counts I, II, and III of Dorland's Counterclaim). Larson's Cross-Motion for Summary Judgment is GRANTED as to the copyright claims where Larson so moved (Counts I and II of Dorland's Counterclaim).[14]

Dated: September 14, 2023                      /s/ Indira Talwani
                                               United States District Judge

_____

[14] Larson did not move for summary judgment on her claim for Declaratory Judgment (Count VIII of the Second Amended Complaint) or on Dorland's claim for Injunctive Relief (Count III of the Counterclaims). The court anticipates dismissing the request for injunctive relief as moot, granting the request for Declaratory Relief for the reasons set forth above, <u>see</u> Fed. R. Civ. P. 56(f)(1), and entering a final judgment as to all claims. Any objection to proceeding in this manner shall be filed no later than September 20, 2023.