# Exhibit A

Memorandum Opinion & Order
*Kelley v. Morning Bee, Inc., et al.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                   :

MICHAEL KELLEY,                      :
                                    :

              Plaintiff,   :

                                    :

          -against-     :

MORNING BEE, INC., *and* APPLE, INC.,   :
                                    :

           Defendants. :
                                    :

------------------------------------------------------------------ X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 9/26/2023 |

1:21-cv-8420-GHW

MEMORANDUM
OPINION AND ORDER

**GREGORY H. WOODS, United States District Judge:**

Michael Kelley is a professional photographer, whose photographs of architecture and aircrafts have appeared in publications, art exhibits, and advertisements for clients including HGTV, Tesla Motors, and Discovery Networks. Dkt. No. 1, Complaint ("Compl.") ¶ 6. Morning Bee and Apple, among other things, "produc[e] and publish[] visual media content." *Id.* ¶¶ 7, 8. This matter arises from a series of ten copyrighted photographs, displayed together in an exhibit entitled "Airportraits," that briefly appears in the background of a documentary, "Billie Eilish: The World's A Little Blurry" (the "Film"). *Id.* ¶¶ 1, 14, 17, 18, 27. The Film was produced by Morning Bee and released on Apple's streaming platform, Apple TV+. *Id.* ¶¶ 19, 20. Morning Bee and Apple neither licensed the "Airportraits" photographs from Kelley, nor did they seek nor obtain Kelley's permission for their use in the Film. *Id.* at ¶ 35. Kelley brought this action, alleging that Morning Bee and Apple infringed on his copyrights of the ten photographs, that they did so intentionally, and that as a consequence of the infringement, Kelley is owed damages and attorneys' fees. *Id.* ¶¶ 39–43.

Before the Court is a motion to dismiss the complaint in its entirety and with prejudice. Dkt. No. 26. Because the use of the photographs at issue here is de minimis and, in any case, fair use by Defendants, Defendants' motion to dismiss is GRANTED.

## I.     BACKGROUND

### A.  Facts

Plaintiff is a professional photographer known for his photographs of architecture and aircrafts.  Compl. ¶ 6.  Plaintiff has worked with clients like Tesla Motors, Discovery Networks, HGTV, Herman Miller, and MAD Architects.  *Id.*  One of Plaintiff's compilations, "Airportraits," consists of photographs of airports, captured with a stationary camera on location for extended periods of time.  *Id.* ¶ 9.  Plaintiff examines the numerous resulting images and cuts, stitches, and assembles each departing airplane onto a background image captured over the same time period, producing a singular composite image of "a day's worth of air traffic."  *Id.* ¶ 10.

In 2018, New Zealand's Auckland Airport featured ten of the "Airportraits" photographs in a solo art exhibit.  *Id.* ¶ 14.  Viewing the exhibit head-on, the photographs were spread across three walls, one wall to the back, one to the left, and another to the right.  *Id.*  The left wall featured four photographs from the "Airportraits" series:  "London Heathrow 27L (Terminal 5 and Tower)" (Compl. Ex. B), "London Heathrow 27L (Planespotting)" (Compl. Ex. C), "London Heathrow 09L (100, 50, 40)" (Compl. Ex. D), and "Wake Turbulance" (Compl. Ex. A).  *Id.* ¶¶ 13, 16.  The back wall featured two such photographs:  "Auckland International 23L" (Compl. Ex. E) and "Auckland Airport II (Terminal)" (Compl. Ex. F).  *Id.* ¶¶ 13, 15.  And the right wall featured four such photographs:  "Los Angeles International 24L" (Compl. Ex. G), "Dubai International 12R (Morning Heavy Departures)" (Compl. Ex. H), "Tokyo Haneda 05 (Great Wave)" (Compl. Ex. I), and "Sydney Kingsford Smith 34L" (Compl. Ex. J).  *Id.* ¶¶ 13, 16.  Each photograph is registered with the U.S. Copyright Office under Copyright Registration Numbers VA2024076 (Compl. Exs. A, B, C, D, E, G, H, I, J) and VAU1439056 (Compl. Ex. F).  *Id.* ¶ 17.

In 2021, Apple and Morning Bee produced a film entitled "Billie Eilish:  The World's A Little Blurry" (the "Film").  *Id.* ¶¶ 18–20.  The Film was released on Apple TV+, Apple's streaming

platform. *Id.* ¶ 20. The Film "take[s] a deeply personal look at the extraordinary teenager Billie Eilish," a then-nineteen-year-old, seven-time GRAMMY® Award–winning musical artist. *Id.* ¶ 18 (citation omitted). The documentary-style Film chronicles Eilish's "journey on the road, onstage, and at home with her family as the writing and recording of her debut album changes her life." *Id.* ¶ 21. The Film captures a series of moments in "Eilish's daily life, from creating music with her brother at home . . . , to getting her driver's license . . . , to meeting and getting to know Justin Bieber . . . , to traveling and performing in concerts . . . ." Defendants' Mem. of Law in Support of Motion to Dismiss ("Defendants' Mem."), Dkt. No 27, at 9 (citations omitted). The asserted purpose of the documentary is to "document[] the real-world activities of Billie Eilish, a Grammy-winning pop star and cultural phenomenon." *Id.*

In following Eilish through her life experiences and career, the Film depicts Eilish's arrival at the Auckland Airport, during a stop on her world tour. Compl. ¶¶ 22, 32. At the time, Plaintiff's "Airportraits" series happened to be on display at the airport. *Id.* ¶¶ 14, 23. The full scene in question, depicting Eilish's arrival, occurs for approximately forty-three seconds, between 1:33:20 and 1:34:03 (hour:minute:second) of the Film.[1] *See* the Film at 1:33:20–1:34:03. In the scene, the Hātea Kapa Haka, a Māori cultural group, performs a rendition of one of Eilish's songs for her, accompanied by singing, dancing, and the donning of traditional Māori attire. *See id.* at 1:33:22– 1:1:33:57 (depicting the performance). Eilish's reaction to the performance is also captured in the Film. *See id.* at 1:33:26–1:33:56. The performance takes place adjacent to the three walls of the "Airportraits" display, such that Plaintiff's photographs appear behind and to the sides of the Hātea Kapa Haka performers. Compl. ¶ 24. Though the full scene lasts nearly a minute, the copyrighted

---

[1] Timestamps in the complaint differ slightly from those noted in this opinion. Timestamps herein are derived from the Court's viewing of the DVD submitted by the parties as Exhibit A ("the Film") to the Bayard Declaration, Dkt No. 28. All of the Court's citations to the Film reference this submission and its timestamps.

photographs themselves appear on screen for a total of approximately fifteen seconds,[2] as the shots alternate between showing the performers and depicting Eilish and her family's reactions to the performance.  *See* the Film, at 1:33:20–1:34:03.

During the scene, Plaintiff's photographs appear in the background in five distinct, continuous, and uninterrupted shots:  (1) a shot spanning three seconds, occurring at 1:33:23–26 in the Film, depicting the performers beginning their act, standing in front of the back and right walls of the exhibit, *see* Figure 1, *infra*; (2) a shot lasting one second, from 1:33:33–34 in the Film, whereby all three walls of the exhibit are now in view, though poorly lit, in the background, with the left and right walls shown at a sharp camera angle, and the back-wall photographs largely obstructed by the performers standing in front of them, *see* Figure 2, *infra*; (3) a similar eight-second shot, from 1:33:37–45 in the Film, in which all three walls of the exhibit are again in view as in Figure 2, though Figures 2 and 3 are interrupted by the camera briefly panning to Eilish for her reaction, *see* Figure 3, *infra*; (4) a two-second shot, from 1:34:00–02, in which one photo on the back wall, Compl. Ex. F, and the right wall of the exhibit are visible, though largely obstructed by the performers and audience members greeting one another in front of the photographs, *see* Figures 4(a) and 4(b), *infra*; and (5) a one-second shot, occurring at 1:34:02–03 in the Film, in which the two photographs on the back wall are out of focus, in the background, partially out of frame, and largely obstructed by Eilish and the performers posing for a photograph, *see* Figure 5, *infra*.

Throughout, the camera does not focus on any one (or collection) of the photographs at any time, nor are they more well-lit than the performers or Eilish and her family, nor are the photographs visually prominent in any of the five shots.  At all times throughout the "Airportraits" exhibit's five brief shots of screentime, each of the ten photographs appears in the background,

---

[2] Specifically, the photographs are visible during the following timestamps in the Film:  1:33:23–26; 1:33:33–34; 1:33:37–45; 1:34:00–02; and 1:34:02–03.  *See* the Film at 1:33:23–1:34:03.

momentarily, oftentimes obstructed by the performers and/or Eilish and her family, all of whom comprise the visual focus of the scene.[3]  *See* the Film, at 1:33:20–1:34:03.

These five shots are recurringly interspersed with shots of Eilish and her family's reactions. *See* the Film, at 1:33:26–1:33:56.  These include Eilish's jaw dropping as the group begins performing their rendition of her song, "Ocean Eyes;" Eilish's family members reacting warmly, with ear-to-ear smiles; and Eilish swaying with the rhythm of the song, enraptured by the performance.  *See id.*  The camera then turns to Eilish and her family members approaching the performers and greeting them with the traditional Māori greeting of the hongi and haruru (pressing noses together and shaking hands).[4]  *See* the Film, at 1:33:56–1:34:02.  The scene concludes with Eilish posing with the performers for a photo, as the back-wall photographs of Plaintiff are barely visible in the background.  *See* the Film, at 1:34:02–1:34:03.  The entire Film spans 140 minutes and 36 seconds. *See* the Film.  Thus, Plaintiff's photographs appear on screen for approximately 0.18 percent of the Film's total screentime.[5]

The audio heard during this scene focuses exclusively on the performance and Eilish's tour; there is no commentary at all on the "Airportraits" series visible in the background.  *See* the Film, at 1:33:20–1:34:03.  It gradually transitions from the sound of the Hātea Kapa Haka performance (as the performers strum the guitar and sing along to Eilish's "Ocean Eyes"), to audio from radio show interviews of Eilish.  *See id.*  While Eilish and her family's reaction to the performance is on screen, a radio host says, "Billie Eilish, we promised we would get her on; good morning, Billie."  *Id.* at 1:33:49–1:33:52.  Again while depicting the family's reaction, audio cuts to a second radio host: "Hey, Billie, good morning, how you doing?"  *Id.* at 1:33:52–1:33:54.  And, back to the first host:

---

[3] *See* Part III(A) for a fuller description of the contents of Figures 1–5.
[4] *See* Russell Bishop & Ted Glynn, *Research in Maori Contexts: An Interpretation of Participatory Consciousness*, 20 J. INTERCULTURAL STUDS. 167, 174 (1999) (describing the traditional practice of the hongi and haruru).
[5] By the Court's calculation, 15 divided by 8,436 yields approximately 0.0018, or 0.18 percent.

"We went to Coachella, me and the girlfriend—" and, as the camera pans to Eilish greeting the performers and exchanging hongis, the overlain audio continues: "My girlfriend freaked at your performance. Everyone *loves* you, you're *seventeen-years-old*, and you're owning the world." *See id.* at 1:33:54–1:34:05. The camera pans to Eilish posing with the performers, as the radio host continues: "That must be mental, right?" *See id.* This audio clip carries over into the next scene, where Eilish is seen remotely participating in the radio show interview via her cell phone. Eilish laughs and responds: "It's crazy, dude." *See id.* at 1:34:05–1:34:07. At no point are the background photographs discussed, commented on, or acknowledged by the performers, Eilish, or her family members in any way. *See id.* at 1:33:20–1:34:03.

Defendants did not license the Photographs, nor did they seek nor receive permission from Plaintiff for their appearance in the background of this scene in the Film. Compl. ¶ 35.

### B. Procedural History

Plaintiff initiated this action on October 12, 2021. Dkt. No. 1. Defendants moved to dismiss the entire complaint on January 31, 2022. Mot. to Dismiss Compl., Dkt. No. 26. On February 22, 2022, Plaintiff filed a memorandum of law in opposition to Defendants' motion to dismiss. Plaintiff's Mem. in Opposition to Defendants' Mot. to Dismiss ("Plaintiff's Opp'n"), Dkt. No. 31. Defendants responded on March 4, 2022 with a memorandum of law in further support of the motion to dismiss. Dkt. No. 32. The motion is now fully briefed.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In the

copyright context, Plaintiff must "state a claim which, at a basic level, . . . allege[s] or . . . prove[s] one or more of the basic copyright law tenets: the existence of a copyrightable work, ownership of that work, and infringement of that work." 2 Copyright Law in Business and Practice § 11:10 (rev. ed.). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

"A court's task" on a motion to dismiss "is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a

contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

Finally, on a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006). A court may also consider "any document attached to it as an exhibit, . . . or any document incorporated in it by reference." *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir. 1985) (citing Fed. R. Civ. P. 10(c) (other citations omitted)). Moreover,

> [i]n copyright infringement actions, "the works themselves supersede and control contrary descriptions of them," including "any contrary allegations, conclusions or descriptions of the works contained in the pleadings." When a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because "what is required is only a visual comparison of the works."

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citations omitted). Thus, the Court considers the Film itself, and not any contradictory or misleading descriptions of the Film in Plaintiff's Complaint, in deciding Defendants' motion to dismiss.

## III. DISCUSSION

### A. Copyright Infringement

The complaint fails to state a claim of copyright infringement that is plausible on its face. "In order to establish a claim of copyright infringement, 'a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's.'" *Peter F. Gaito Architecture, LLC*, 602 F.3d at 63 (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999)). Here, the parties dispute neither the validity of Plaintiff's copyrights on the photographs at issue, nor that Defendants actually copied the photographs in the Film. The Court thus considers whether a substantial similarity exists between Defendants' Film

8

and Plaintiff's photographs. It is well settled that such an inquiry is appropriate at the pleading stage on a motion to dismiss. *See id.* at 63–65. The Court may do so upon its own direct visual comparison of the two works at issue, alongside a consideration of the facts as asserted in the complaint. *Id.* (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766 (2d Cir. 1991)). Moreover, "[i]n copyright infringement actions, 'the works themselves supersede and control contrary descriptions of them,' including 'any contrary allegations, conclusions or descriptions of the works contained in the pleadings.'" *Id.* at 64 (citations omitted).

As to Defendants' Film and each of Plaintiff's photographs, the Court finds that no substantial similarity exists giving rise to a plausible claim of copyright infringement. A finding of substantial similarity "requires that the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997). "The qualitative component concerns the copying of expression, rather than ideas," whereas "[t]he quantitative component generally concerns the amount of the copyrighted work that is copied." *Id.* Where visual works are at issue, "the quantitative component . . . also concerns the observability of the copied work—the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting, camera angles, and prominence." *Id.* In reviewing the work, the Court considers observability from the perspective of the "average lay observer." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 218 (2d Cir. 1998). When the copying is de minimis—that is, when the copying "has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity"—it is not unlawful. *Ringgold*, 126 F.3d at 74–75.

In applying the *Ringgold* factors, courts have considered the recognizability of the work. *See, e.g., id.* at 77 (finding that use was not de minimis where the copyrighted work was "clearly visible"

and "recognizable as a painting . . . with sufficient observable detail for the 'average lay observer' . . . to discern" the subject matter painted in the artist's style); *Sandoval*, 147 F.3d at 218 (finding de minimis use where copyrighted "photographs as used in the movie [were] not displayed with sufficient detail for the average lay observer to identify even the subject matter of the photographs, much less the style used in creating them," rendering the photographs "virtually unidentifiable"). The distance at which a visual work is perceived within another visual work also matters, as does whether it appears in the foreground or the background. *See Sandoval*, 147 F.3d at 218 (describing the "great distance" at which photographs were displayed in a film as contributing to their de minimis use); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008) (finding de minimis copying where a copyrighted work, *inter alia*, "is always in the background; it is never seen in the foreground"). Additionally, courts consider whether and the extent to which the "dialogue, action, [and/]or camera work [in the secondary work] . . . calls the viewer's attention to the [copyrighted work]," *Ringgold* 126 F.3d at 73; *see also Gottlieb Dev. LLC*, 590 F. Supp. 2d at 632 (the copyrighted work "never appears by itself or in a close-up" and "[i]t is never mentioned and plays no role in the plot"). The degree of obstruction likewise matters. *See, e.g., Gottlieb Dev. LLC*, 590 F. Supp. 2d at 632 (finding de minimis use where a work is "almost always partially obscured . . . and . . . fully visible for only a few seconds during the entire scene"); *LMNOPI v. XYZ Films, LLC*, 449 F. Supp. 3d 86, 92 (E.D.N.Y. 2020) (finding de minimis use where a visual work "appears in the background of the scene and in a partially obscured view," *inter alia*).

Defendants' copying here is de minimis. Viewed from the perspective of a lay observer, the observability of each of the ten "Airportraits" photographs in the Film is minimal. Plaintiff's photographs appear in the 140-minute Film from a total of seven to fourteen seconds per photograph. *See* Table 1. In these fleeting shots, moreover, the photographs are oftentimes obstructed, out of focus, under low lighting, displayed at an angle to the viewer, and at all times in

the background—far from appearing prominently in the Film. *See id.*; *see also Sandoval*, 147 F.3d at

218 (finding de minimis copying where photographs used in a film were "not displayed with

sufficient detail" to be identifiable, "displayed in poor lighting and at great distance," in addition to

being "out of focus and displayed only briefly"); *LMNOPI*, 449 F. Supp. 3d at 91 (finding de

minimis use where a visual work appears for "approximately three-and-a-half seconds of a film that

runs 93 minutes," where the work is "at all times in the background," frequently obstructed, and

"undeniably" not the focus of the scene, "never referenced in the Film and . . . completely irrelevant

to the Film's plot").

The ten photographs can be seen in five distinct, uninterrupted shots, represented in Figures

1 through 5 below. These screenshots aim to represent the clearest stills (that is, stills in which the

photographs are relatively the most highly observable) within each uninterrupted shot in which the

photographs are viewable in the Film. Notably, by their nature, static screenshots fail to capture the

camera movement between the performers, Eilish, and her family, nor do they adequately show the

fleeting nature of the five shots—each of which, taken alone, remains on screen for a range of

approximately one to eight seconds apiece.

The momentary nature of each photograph's appearance here weighs heavily in favor of a

finding of de minimis use. *See, e.g.*, *Sandoval*, 147 F.3d at 218 (noting that photographs' "fleeting[]"

appearance in film contributed to a finding of de minimis use); *Gottlieb Dev. LLC*, 490 F. Supp. 2d at

632 (noting that the copyrighted work "appears in the scene sporadically, for no more than a few

seconds at a time," contributing to the court's finding of de minimis use); *LMNOPI*, 449 F. Supp. 3d

at 92 (emphasizing a work's "3.5 second appearance . . . in a 93-minute film" as contributing to a

finding of de minimis use). With their fifteen seconds of fame in a 140-minute Film, Plaintiff's

photographs appear on screen for approximately 0.18 percent of the Film's total screentime—hardly

a significant length of time in the film. *Compare LMNOPI*, 449 F. Supp. 3d at 92 (finding de minimis

11

use where a visual work appeared for 3.5 seconds in a 93-minute Film, i.e. the copyrighted work received 0.06 percent of screentime), *with Hirsch v. Complex Media, Inc.*, No. 18 CV. 5488, 2018 WL 6985227 at *1 (S.D.N.Y. Dec. 10, 2018) (finding no de minimis use where a visual work appeared for four seconds in a 1:44 minute video, i.e. comprising 3.8 percent of screentime), *and Ringgold*, 126 F.3d at 73 (finding no de minimis use where a visual work appeared cumulatively for twenty-seven seconds of a twenty-four-minute episode, i.e. comprising 1.88 percent of screentime).

**Table 1[6]**

| | Plaintiff's Photograph | Screentime | Fig. | Observability[7] |
|---|---|---|---|---|
| **Left Wall** | **Compl. Ex. A,** "Wake Turbulence" | 1:33:33–34 | 2 | Observable for 1 second, appears partially obstructed, out of focus, low lighting, in the background, at a distance, at a sharp angle. *See* Figure 2. |
| | | 1:33:39–45 | 3 | Observable for 6 seconds, appears partially obstructed, out of focus, low lighting, in the background, at a distance, at a sharp angle. *See* Figure 3. |
| | **Compl. Ex. B,** "London Heathrow 27L (Terminal 5 and Tower)" | 1:33:33–34 | 2 | Observable for 1 second, appears approximately half obstructed, out of focus, low lighting, in the background, at a distance, at a sharp angle, indiscernible to lay observer as this photograph. *See* Figure 2. |
| | | 1:33:39–45 | 3 | Observable for 6 seconds, appears majority obstructed, out of focus, low lighting, in the background, at a distance, at a sharp angle, indiscernible to lay observer as this photograph. *See* Figure 3. |
| | **Compl. Ex. C,** "London Heathrow 27L (Planespotting)" | 1:33:33–34 | 2 | Observable for 1 second, appears partially obstructed, out of focus, low lighting, in the background, at a distance, at a sharp angle. *See* Figure 2. |
| | | 1:33:39–45 | 3 | Observable for 6 seconds, appears partially obstructed, out of focus, low lighting, in the background, at a distance, at a sharp angle. *See* Figure 3. |

---

[6] The Court produced Table 1 based on its viewing of the Film, *see* Declaration of Samuel Bayard, Dkt. No. 28, Ex. A (the Film), as it is instructed to do, *see Peter F. Gaito Architecture, LLC*, 602 F.3d at 64.

[7] "Observability" notations pertain to "the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting, camera angles, and prominence," in accordance with *Ringgold*, 126 F3d at 75.

| | **Compl. Ex. D**, "London Heathrow 09L (100, 50, 40)" | 1:33:33–34 | 2 | Observable for 1 second, appears fully obstructed, in the background, at a distance, indiscernible to lay observer as this photograph. *See* Figure 2. |
|---|---|---|---|---|
| | | 1:33:39–45 | 3 | Observable for 6 seconds, appears majority obstructed, out of focus, low lighting, in the background, at a distance, at a sharp angle, indiscernible to lay observer as this photograph. *See* Figure 3. |
| | **Compl. Ex. E**, "Auckland International 23L" | 1:33:23–26 | 1 | Observable for 3 seconds, appears approximately half obstructed, out of focus, in the background, at a distance. *See* Figure 1. |
| | | 1:33:33–34 | 2 | Observable for 1 second, appears approximately half obstructed (bottom half blocked), out of focus, in the background, at a distance. *See* Figure 2. |
| | | 1:33:37–45 | 3 | Observable for 8 seconds, appears approximately half obstructed (bottom half blocked), out of focus, in the background, at a distance. *See* Figure 3. |
| | | 1:34:02–03 | 5 | Observable for 1 second, appears majority out of frame, partially obstructed, low lighting, out of focus, in the background, indiscernible to lay observer as this photograph, at a distance. *See* Figure 5. |
| **Back Wall** | **Compl. Ex. F**, "Auckland Airport II (Terminal)" | 1:33:23-26 | 1 | Observable for 3 seconds, appears majority obstructed, low lighting, out out of focus and at an angle, in the background, at a distance, hardly discernible to lay observer as this photograph. *See* Figure 1. |
| | | 1:33:33–34 | 2 | Observable for 1 second, appears approximately half obstructed (bottom half blocked), out of focus, in the background, at a distance. *See* Figure 2. |
| | | 1:33:37–45 | 3 | Observable for 8 seconds, appears approximately half obstructed (bottom half blocked), out of focus, in the background, at a distance. *See* Figure 3. |
| | | 1:34:02 | 4(b) | Observable for 1 second, appears partially out of frame, out of focus, low lighting, in the background, at a distance. *See* Figure 4(b). |
| | | 1:34:02–03 | 5 | Observable for 1 second, appears majority obstructed, out of focus, low lighting, in the background, at a distance, hardly discernible to lay observer as this photograph. *See* Figure 5. |

13

| | | | | |
|---|---|---|---|---|
| **Right Wall** | **Compl. Ex. G**, "Los Angeles International 24L" | 1:33:23–26 | 1 | Observable for 3 seconds, appears majority obstructed, low lighting, out of focus and at an angle, at an angle, in the background, at a distance, hardly discernible to lay observer as this photograph. *See* Figure 1. |
| | | 1:33:33–34 | 2 | Observable for 1 second, appears fully unobstructed, though out of focus, low lighting, in background, at a distance, at a sharp angle, hardly discernible to lay observer as this photograph. *See* Figure 2. |
| | | 1:33:37–45 | 3 | Observable for 8 seconds, appears fully unobstructed, though out of focus, low lighting, in background, at a distance, at a sharp angle, hardly discernible to lay observer as this photograph. *See* Figure 3. |
| | | 1:34:00–02 | 4(a), 4(b) | Observable for 2 seconds, appears partially obstructed to fully obstructed (as clip unfolds), out of focus, in the background, at a distance, at an angle. *See* Figures 4(a), 4(b). |
| | **Compl. Ex. H**, "Dubai International 12R (Morning Heavy Departures)" | 1:33:23–26 | 1 | Observable for 3 seconds, appears nearly unobstructed, out of focus and at an angle, low lighting, in the background, at a distance, hardly discernible to lay observer as this photograph. *See* Figure 1. |
| | | 1:33:33–34 | 2 | Observable for 1 second, appears fully unobstructed, though out of focus, low lighting, in the background, at a distance, at a sharp angle, planes not discernible as airplanes—much less discernible to lay observer as this photograph. *See* Figure 2. |
| | | 1:33:37–45 | 3 | Observable for 8 seconds, appears fully unobstructed, though out of focus, low lighting, in background, at a distance, at a sharp angle, planes not discernible as airplanes—much less discernible to lay observer as this photograph. *See* Figure 3. |
| | | 1:34:00–02 | 4(a), 4(b) | Observable for 2 seconds, appears partially obstructed, out of focus, in the background, at a distance, at an angle. *See* Figure 4(a), Figure 4(b). |
| | **Compl. Ex. I**, "Tokyo Haneda 05 (Great Wave)" | 1:33:23–26 | 1 | Observable for 3 seconds, appears nearly fully unobstructed, out of focus and at an angle, low lighting, in the background, at a distance, hardly discernible to lay observer as this photograph. *See* Figure 1. |

| | | 1:33:33–34 | 2 | Observable for 1 second, appears fully unobstructed, though out of focus, low lighting, in the background, at a distance, at a sharp angle, planes not discernible as airplanes—much less discernible to lay observer as this photograph. *See* Figure 2. |
|---|---|---|---|---|
| | | 1:33:37–45 | 3 | Observable for 8 seconds, appears fully unobstructed, though out of focus, low lighting, in the background, at a distance, at a sharp angle, planes not discernible as airplanes—much less discernible to lay observer as this photograph. *See* Figure 3. |
| | | 1:34:00–01 | 4(a), 4(b) | Observable for 2 seconds, appears partially out of frame, out of focus, in the background, at a distance, at an angle, planes not discernible as airplanes—much less discernible to lay observer as this photograph. *See* Figures 4(a), 4(b). |
| | **Compl. Ex. J,** "Sydney Kingsford Smith 34L" | 1:33:23–26 | 1 | Observable for 3 seconds, appears majority obstructed, out focus and at an angle, low lighting, in the background, at a distance, barely discernible to lay observer as this photograph. *See* Figure 1. |
| | | 1:33:33–34 | 2 | Observable for 1 second, appears fully unobstructed, though out of focus, low lighting, in the background, at a distance, at a sharp angle. *See* Figure 2. |
| | | 1:33:37–45 | 3 | Observable for 8 seconds, appears fully unobstructed, though out of focus, low lighting, in the background, at a distance, at a sharp angle. *See* Figure 3. |
| | | 1:34:00–02 | 4(a), 4(b) | Observable for 2 seconds, appears nearly fully obstructed, in the background, at a distance, at an angle, hardly discernible to lay observer as this photograph. *See* Figures 4(a), 4(b). |

**Figure 1, 1:33:24[8]**



In the shot captured in Figure 1, Plaintiff's photographs displayed on the back and right-side walls of the exhibit are visible. These include—on the back wall, from left to right—Compl. Exs. E and F; and—on the right wall, from left to right, moving clockwise—Compl. Exs. G, H, I, and J. Analyzed under the *Ringgold* factors, *see Ringgold*, 126 F3d at 75, the photographs marked in the complaint as Exs. E and F are each observable for approximately three seconds; they appear in the background, at a distance, and out of focus. *See* Figure 1. Approximately half of Ex. E is obstructed by the performers, who stand blocking much of the bottom half of the photograph; and the majority of Ex. F appears obstructed by the performers, standing in front of and blocking most of it. *Id.* This degree of obstruction militates in favor of a finding of de minimis use of Exs. E and F in this shot. *See Gottlieb Dev. LLC*, 590 F. Supp. 2d at 632; *LMNOPI*, 449 F. Supp. 3d at 92. Additionally, in this shot, Ex. F is hardly discernible to a lay observer as a photograph of airplanes at all, let alone

---

[8] Time signatures conveyed in hour:minute:second format. Figure 1 is generally representative of the Film's time period 1:33:23–26.

as Plaintiff's "Auckland Airport II (Terminal)" photograph—again suggesting de minimis use. *See* the Film, at 1:33:23–26; *see also Sandoval*, 147 F.3d at 218 (finding de minimis use where photographs used in a film were "not displayed with sufficient detail for the average lay observer to identify even the subject matter of the photographs, much less the style used in creating them").

Similarly, on the right wall in this shot, the photographs marked in the complaint as Exs. G, H, I, and J are visible for approximately three seconds; they each appear, again, in the background, at a distance, out of focus, at an angle, and in relatively low lighting. The majority of Ex. G appears obstructed by the performers standing in front of it, and in this shot, a lay observer would struggle recognizing this image as Plaintiff's "Los Angeles International 24L." Ex. H is likewise: It is at such a distance and out of focus such that it is difficult to discern as a photograph of airplanes, let alone Plaintiff's "Dubai International 12R (Morning Heavy Departures)." The lighting and blurriness of Ex. I is even worse; it is hardly discernible to a lay observer as "Tokyo Haneda 05 (Great Wave)." Last, a majority of Ex. J obstructed by the performers, and again, a lay observer would struggle recognizing it as Plaintiff's "Sydney Kingsford Smith 34L." *See* the Film, at 1:33:23–26. The minimal observability of Compl. Exs. G, H, I, and J in this shot is similar to the minimal observability of the underlying work in *Sandoval*, 147 F.3d at 218, suggesting de minimis use of these four photographs in this shot.

**Figure 2, 1:33:33[9]**



As Figure 2 shows, all three walls of the exhibit are in view in this shot, with the exhibit again comprising the background of the scene. The left wall is now visible, featuring Compl. Exs. A (top left corner), B (lower left corner), C (far right), and D (second from the lower left). On the left wall in this shot, Compl. Exs. A, B, C, and D are each observable for approximately one second; they each appear in the background, at quite a distance, in poor lighting, and on a sharp angle. None of the left-wall photographs in this shot are readily recognizable as Plaintiff's; they are each either partially obstructed (Compl. Exs. A, B, and C) or almost totally obstructed (Compl. Ex. D) by the camera operators and their equipment. Compl. Exs. B and D, in particular, are almost totally indiscernible in this shot. *See* the Film, at 1:33:33–34. Again, similar to the work in *Sandoval*, 147 F.3d at 218, observability weighs in favor of de minimis use for the photographs marked Compl. Exs. A, B, C, and D in this shot.

---

[9] Figure 2 is generally representative of the Film's time period 1:33:33–34.

18

In comparison to this shot's view of the left wall, the back-wall photographs here are relatively easier to see, but still not clearly discernible as photographs of airplanes, let alone Compl. Exs. E and F; they are observable for approximately one second, during which they are each approximately half-obstructed (with the lower halves of each photograph obstructed by the performers), out of focus, in relatively poor lighting conditions, at quite a distance, and in the background of the wide-angle shot. *See* the Film, at 1:33:33–34. Thus, use of Compl. Exs. E and F in this shot is likewise de minimis.

The photographs on the right wall in this shot are totally unobstructed, yet they each appear again for approximately one second, and on a sharp angle, in the background, at quite a distance, in relatively low lighting, and out of focus. Under these viewing conditions, Compl. Ex. G is hardly discernible to a lay observer as "Los Angeles International 24L." Compl. Exs. H and I are so out of focus and dimly lit that their subject matter (airplanes) is indiscernible; and a lay observer would likewise strain their eyes to recognize Compl. Ex. J as Plaintiff's photograph. *See* the Film, at 1:33:33–34; *Sandoval*, 147 F.3d at 218.

Figure 3, 1:33:41[10]



The third shot, represented by Figure 3, is almost identical to the view we have of the photographs in Figure 2.[11]  The same observability conditions, *see Ringgold*, 126 F3d at 75, are present with respect to each photograph's degree of obstruction, lighting, focus, camera angles, distance, and presence in the background of the shot—except the photographs in this shot are visible for six (in the case of Compl. Exs. A, B, C, and D) to eight (for Compl. Exs. E, F, G, H, I, and J) continuous seconds at a time.  *See* the Film, at 1:33:37–45.  Though this shot contains a lengthier depiction of each photograph, it remains clear that the photographs are not the focus of the scene; the focus is the performance of Eilish's song for her, and Eilish's reaction thereto.  *Cf. LMNOPI*, 449 F. Supp. 3d at 91.  Indeed, the shots represented in Figures 2 and 3 are broken up by a three-second intermission wherein the camera pans to Eilish and her family members to capture their reactions to

---

[10] Figure 3 is generally representative of the Film's time period 1:33:37–45.

[11] Figures 2 and 3 are depicted as two separate shots because they are separated by the camera panning to Eilish and her family's reaction.  Thus, they represent two distinct continuous shots wherein Plaintiff's photographs are visible, though the view of the photographs themselves is almost identical between these two shots in the Film.

the performance—before returning to a wide-angle shot to depict the performers in full once more.

Thus, the photographs visible in this shot, too, are of de minimis use.

**Figure 4(a), 1:34:00; 4(b), 1:34:01[12]**



---

[12] Figure 4 is generally representative of the Film's time period 1:34:00–02. Two stills—4(a) and 4(b)—are included to depict the movement of the individuals obstructing the photographs.

21



Figures 4(a) and 4(b) capture the movement of the camera between the time period 1:34:00 and 1:34:02, as the camera follows Eilish greeting a performer and leaning in for an exchange of the hongi and haruru.  In the beginning of this shot, as shown in Figure 4(a), only the right-wall photographs are visible; as the camera moves, Compl. Ex. F (on the back wall) is briefly visible as well.  Compl. Ex. G (the leftmost photograph on the right wall) is observable for approximately two seconds in this shot; it is in the background, out of focus, at a distance, and it goes from being partially to nearly fully obstructed as the clip unfolds (see progression from Figure 4(a) to Figure 4(b)).  Given their minimal observability, *see Ringgold*, 126 F3d at 75, the use of Compl. Exs. F and G in this shot, too, is de minimis.

Going clockwise on the right wall, Compl. Ex. H begins partially out of frame and is partially obstructed throughout its two-second appearance in this clip; it is quite blurry, at an angle, at a distance, and in the background.  Compl. Ex. I appears similarly, beginning partially out of frame and remaining blurry and in poor lighting, at an angle, at a distance, and in the background throughout its two-second appearance in this clip.  The planes are hardly discernible as airplanes in

22

Compl. Ex. I, let alone as Plaintiff's photograph. Last, Compl. Ex. J is even less readily discernible in this shot; during its two-second showing here, it appears nearly fully obstructed, in low lighting, in the background, at a distance, and would be hardly discernible to a lay observer as this photograph. As for Compl. Ex. F, the back-wall photograph observable for approximately one second, Compl. Ex. F appears partially out of frame, out of focus, in the background, at a distance, and in relatively low lighting in this shot. *See* the Film, at 1:34:00–02. Again, given their minimal observability, *see Ringgold*, 126 F3d at 75, the use of Compl. Exs. F, H, I, and J in this shot appears to be de minimis.

**Figure 5 1:34:03[13]**



The photographs visible in Figure 5 are hardly recognizable as the Plaintiff's photographs at all. On the back wall, Compl. Ex. E (left side) is observable here for approximately one second; the majority of Compl. Ex. E appears out of frame, it is partially obstructed, in poor lighting, out of focus, at a distance, and in the background. In these conditions, this photograph is indiscernible to

---

[13] Figure 5 is generally representative of the Film's time period 1:34:02–03.

a lay observer as Plaintiff's "Auckland International 23L." Compl. Ex. F (right side of the back wall) is likewise observable for approximately one second; the majority of Compl. Ex. F is obstructed by the performers, out of focus, in poor lighting, at a distance, and in the background. Compl. Ex. F, too, is hardly discernible to a lay observer as Plaintiff's photograph. *See* the Film, at 1:34:02–03. For these reasons, the use of Compl. Exs. E and F in this shot is again de minimis. *See Ringgold*, 126 F3d at 75.

For many of the above shots, an average lay observer would have difficulty (as this Court did) even distinguishing which photograph lies where in a given screenshot—let alone recognizing the photographs as discrete photographs of Plaintiff, but for the presence of Plaintiff's name (though blurry and at a distance) and the exhibit title ("Airportraits") on the back wall. At no point are *any* of the ten photographs at issue viewable close-up, in focus, or prominently as the center of attention—nor are they commented upon in the audio or discussed in any way—in any shot of the fifteen cumulative seconds during which any photograph appears in the 140-minute-long documentary. *See* the Film, at 1:33:23–1:34:03. On both qualitative and quantitative grounds, *see Ringgold*, 126 F3d at 75, the Court finds that the use of each photograph in the Film is de minimis.

Despite the repeated showings of the photographs across five discrete clips, a strongly cumulative effect is not present here. This is unlike the copying at issue in *Ringgold*, where the "repetitive effect" of seeing the paintings again and again, though briefly each time in a television episode "somewhat reenforce[d] the[ir] visual effect" on the viewer. *Id.* at 76–77. There, the separate segments combined totaled to approximately 26.75 seconds, *id.* at 76, in a twenty-three minute episode, *Ringgold v. Black Ent. Television, Inc.*, No. 96 CIV 0290 (JSM), 1996 WL 535547, at *1 (S.D.N.Y. Sept. 19, 1996), *rev'd*, 126 F.3d 70 (2d Cir. 1997)—appearing for approximately 1.94 percent of total screentime. Here, the cumulative screentime of the underlying works was approximately one-tenth of the *Ringgold* total screentime percentage. Moreover, in *Ringgold*, the

underlying visual work was purposefully chosen to decorate the scene, *Ringgold*, 126 F.3d at 79,

sometimes appearing "at the center of the screen," *id.* at 73. Here, the photographs "never appear[]

by [themselves] or in a close-up," and they are "never mentioned and play[] no role in the plot," as

in *Gottlieb Dev. LLC*, 590 F. Supp. 2d at 632 (finding de minimis use). The trivial use of each

photograph in the Film's scene does not rise to the level of actionable copying.

## B. Fair Use

Even if Defendants' use of the ten photographs in the Film was not de minimis, the use is

permissible under the doctrine of fair use. The purpose of copyright law is "[t]o promote the

Progress of Science and useful Arts . . . ." U.S. Const., Art. I, § 8, cl. 8. "[W]hile authors are

undoubtedly important intended beneficiaries of copyright, the ultimate, primary intended

beneficiary is the public, whose access to knowledge copyright seeks to advance by providing

rewards for authorship." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). Thus, the fair

use doctrine is a statutory exception to copyright infringement, permitting the unauthorized use of a

protected work for certain purposes. 17 U.S.C. § 107. These may include, for example, "purposes

such as criticism, comment, news reporting, teaching . . . , scholarship, or research." *Id.* In this way,

"[t]he fair use doctrine 'permits courts to avoid rigid application of the copyright statute when, on

occasion, it would stifle the very creativity which that law is designed to foster.'" *Andy Warhol Found.

for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1274 (2023) (citing *Stewart v. Abend*, 495 U.S. 207,

236 (1990)).

"[T]he fair use determination is an open-ended and context sensitive inquiry," in which

courts weigh four non-exclusive statutorily provided factors in light of the purposes of copyright.

*Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013). The fair use factors are: (1) the purpose and

character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the

portion used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the

potential market for or value of the copyrighted work.  17 U.S.C. § 107.  The Second Circuit has

found that these statutory factors are not requirements and that the party requesting a judgment of

fair use need not demonstrate that every factor weighs in its favor.  *Cariou*, 714 F.3d at 705.

Moreover, "[t]he ultimate test of fair use is whether the copyright law's goal of 'promoting the

Progress of Science and useful Arts' 'would be better served by allowing the use than by preventing

it.'"  *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting U.S.

Const., art. I, § 8, cl. 8; *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir.1992)).

> Although courts "most frequently address a proffered fair use defense" at the summary

judgment stage, such a defense may be "so clearly established by a complaint as to support dismissal

of a copyright infringement claim."  *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir.

2016) (citing *Cariou*, 714 F.3d at 707).  Here, the fair use defense is so clearly established that

Plaintiff's copyright infringement action warrants dismissal.  *See Brown v. Netflix, Inc.*, 462 F. Supp. 3d

453, 464 (S.D.N.Y. 2020), *aff'd*, 855 F. App'x 61 (2d Cir. 2021) (granting 12(b)(6) dismissal on

grounds of fair use); *LMNOPI*, 449 F. Supp. 3d at 92–93 (same); *Marano v. Metro. Museum of Art*, 472

F. Supp. 3d 76, 83 (S.D.N.Y. 2020), *aff'd*, 844 F. App'x 436 (2d Cir. 2021) (summary order), *and aff'd*,

844 F. App'x 436 (2d Cir. 2021) (summary order) (same, noting that "cases in which

transformativeness can be determined by doing a side-by-side comparison of the original work and

the secondary use are particularly appropriate for disposition on a Rule 12(b)(6) motion").  In some

cases, as here, "discovery would not provide any additional relevant information in this [fair use]

inquiry;" rather, "[a]ll that is necessary" to the Court in making a fair use determination "are the two

[visual artworks] at issue."  *Arrow Prods., LTD. v. Weinstein Co. LLC*, 44 F. Supp. 3d 359, 368

(S.D.N.Y. 2014).

### 1. Purpose and Character of the Work

The first factor, termed "the heart of the fair use inquiry," *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001), "focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism," *Goldsmith*, 143 S. Ct. at 1273. This past Term, the Supreme Court described this factor as follows:

> [The first fair use] factor considers the reasons for, and nature of, the copier's use of an original work. The "central" question it asks is "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the original), or instead adds something new, with a further purpose or different character." In that way, the first factor relates to the problem of substitution—copyright's bête noire. The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or "supplan[t]," the work . . . .

*Id.* at 1274 (citations omitted). Further, "[w]hether a use shares the purpose or character of an original work, or instead has a further purpose or different character, is a matter of degree." *Id.* at 1274–75. "A use that has a further purpose or different character is said to be 'transformative,'" and "the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id.* at 1275.

Moreover, "the fact that a use is commercial as opposed to nonprofit is an additional 'element of the first factor,'" though "not dispositive." *Id.* at 1276 (citation omitted). Rather, "it is to be weighed against the degree to which the use has a further purpose or different character." *Id.* (citing, inter alia, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.")). And "the first factor also relates to the justification for the use. . . . [A] use that has a distinct purpose is justified because it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create. A use that shares the purpose of a copyrighted work, by contrast, is more likely

to provide 'the public with a substantial substitute for matter protected by the [copyright owner's] interests in the original wor[k] or derivatives of [it],' which undermines the goal of copyright." *Id.* at 1276 (citations omitted). "[T]he question of justification is one of degree." *Id.* at 1277. In sum, "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Id.*

Here, the first fair use factor militates strongly in favor of Defendants. Plaintiff's "Airportraits" photographs and the Film serve unquestionably different purposes. Rather than "'supplant[ing]' the original," the Film "'adds something new, with a further purpose or different character'" to that of the underlying work—the photographs. *Id.* at 1274 (citations omitted). Plaintiff's "Airportraits" photographs "comment upon and capture the spirit of modern aviation." Plaintiff's Opp'n at 11–12. In turn, Plaintiff's photographs "incidentally appear in the background of the Documentary as part of the film's larger purpose of documenting Eilish's life and career, including her world tour that took her to the New Zealand airport." Defendants' Mem. at 3. This is indeed a transformative use, as the "purpose in using the copyrighted images . . . is plainly different from the original purpose for which they were created." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006); *see also Goldsmith*, 143 S. Ct. at 1275. As in *Bill Graham Archives*, the momentary and incidental depiction of Plaintiff's photographs in the documentary-style Film comprises "a transformative purpose of enhancing the biographical [story] . . . , a purpose separate and distinct from the original artistic and promotional purpose for which the images were created." *See* 448 F.3d at 609.

Though the parties do not dispute that the Film is commercial in nature,[14] this is not dispositive. *Goldsmith*, 143 S. Ct. at 1276. In "weigh[ing this element of commercialism] against the

---

[14] Defendants' Mem. at 6 ("[N]o one disputes that the Documentary is a for-profit venture.").

degree to which the use has a further purpose or different character," *id.*, the Court finds that the markedly distinct purposes and characters of the two underlying works nonetheless weigh in favor of fair use. Plaintiff's "Airportraits" series is a highly curated work of fine art, depicting and commenting upon modern aviation; the secondary work, in turn, is a celebrity streaming documentary, showing the life and ascendance to fame of a teenage pop artist. *Cf. Campbell*, 510 U.S. at 579 ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.").

Returning to first principles, "a use that has a distinct purpose is justified because it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Goldsmith*, 143 S. Ct. at 1276 (citation omitted). It is no surprise, then, that "courts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historical scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects." *Bill Graham Archives*, 448 F.3d at 609. Here too, Defendants' fleeting and incidental use of Plaintiff's photographs in their documentary-style Film—which provides a biographical look into Eilish's "journey on the road, onstage, and at home with her family as the writing and recording of her debut album changes her life," Compl. ¶ 21—"furthers the goal of copyright," *Goldsmith*, 143 S. Ct. at 1276. If documentarians had to obtain licenses for every fleeting, incidental capture of a copyrighted work in the background of any given scene, the incentive to create biographical documentaries that accurately represent a subject's life and movements would be severely curtailed. Thus, this factor—"the heart of the fair use inquiry," *On Davis*, 246 F.3d at 174—weighs heavily in favor of a finding of fair use.

## 2. Nature of the Copyrighted Work

The second factor, which looks to the nature of the copyrighted work, is neutral on balance and does not weigh in favor of either party. In reviewing the second factor, courts examine "'(1) whether the [original] work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the [original] work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower.'" *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006) (quoting 2 Howard B. Abrams, The Law of Copyright, § 15:52 (2006)). Returning to first principles, this factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586 (citations omitted).

First, "although 'the creative nature of artistic images typically weighs in favor of the copyright holder,' 'the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose,'" as here. *See Blanch*, 467 F.3d at 257 (quoting *Bill Graham Archives*, 448 F.3d at 612). Second, publicly released works qualify for far less protection from use by others than do unpublished materials. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 564 (1985). "[T]he Copyright Act, which accords the copyright owner the 'right to control the first public distribution' of his work, echo[e]s the common law's concern that the author or copyright owner retain control throughout th[e] critical stage" of deciding whether, when, or how to first disseminate a work. *Harper & Row Publishers, Inc.*, 471 U.S. at 555 (citation omitted). Copyright law operates in part to protect "the author's right to control the first public appearance of his undisseminated expression." *Id.* at 555.

Plaintiff's photographs—a meticulously curated combination of photographs of airports, captured with a stationary camera on location for extended periods of time, Compl. ¶ 9—are

unmistakably creative. The parties do not dispute this.[15] They are also published, which the parties

likewise do not dispute.[16] One photograph, Compl. Ex. A, "has been featured in books, magazines,

and museums." Compl. ¶ 12. Plaintiff "is in the business of selling and licensing his photographs,

including for advertising purposes, for publication in print and online media, and display in art

exhibits internationally." *Id.* ¶ 6. Collectively, the ten photographs were on display at the airport

exhibition incidentally captured in the Film. *Id.* ¶¶ 14–16. In no way is the Film the first instance at

which the photographs were publicly shown or released; the Film did not remove this decision from

Plaintiff's control. The photographs are, in this sense, far away from "the core of intended

copyright protection." *See Campbell*, 510 U.S. at 586.

Because the photograph is creative and published, this factor is neutral on balance and does

not weigh strongly in either party's favor. In any case, this Circuit has noted that the second factor

does not carry much weight in the fair use analysis and is "rarely found to be determinative." *On*

*Davis*, 246 F.3d at 175.

### 3. Amount and Substantiality of the Portion Used

The third factor, "the amount and substantiality of the portion used in relation to the

copyrighted work as a whole," weighs strongly in favor of a finding of fair use. 17 U.S.C. § 107(3).

As the Second Circuit has explained:

> Consideration of the third factor . . . "has both a quantitative and a qualitative component."
> The factor favors copyright holders where the portion used by the alleged infringer is a
> significant percentage of the copyrighted work, or where the portion used is "essentially the
> heart of" the copyrighted work. Courts have also considered "whether the quantity of the
> material used was reasonable in relation to the purpose of the copying."

---

[15] *See* Defendants' Mem. at 13 (acknowledging that "the Photographs are creative").
[16] *See* Plaintiff's Opp'n at 16 (acknowledging that "the Photographs are published").

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 480 (2d Cir. 2004) (citations omitted). "The more of a copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998).

Where "the portion used was minimal and the use was so brief and indistinct," the third fair use factor may "tip . . . decisively against the plaintiff." *Ringgold*, 126 F.3d at 75. As discussed earlier, the use of Plaintiff's photographs in the Film—ranging from seven to fourteen seconds per photograph, out of a 140-minute documentary—was so trivial that this factor decisively tips in favor of Defendants. *See* Part III.A, *supra; see also* the Film, at 1:33:23–1:34:03; Table 1, *supra*.[17] The Film's use of Plaintiff's photographs occurred over such a momentary period of time, with minimal observability. *See* Part III.A, *supra*. The photographs were largely obstructed, appeared at all times in the background, and were used for only a brief moment in the Film, in order to accurately depict the goings-on of Eilish's arrival at the Auckland Airport. This minimal use of the photographs, on both qualitative and quantitative grounds, was certainly "reasonable in relation to the purpose of the copying." *NXIVM Corp.*, 364 F.3d at 480. Thus, the third factor favors Defendants.

### 4. Effect of the Use on the Potential Market.

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As the Second Circuit has stated:

> The fourth factor asks "whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." "Analysis of this factor requires us to balance the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." In assessing market harm, we ask not whether the second work would damage the market for the first . . . , but whether it usurps the market for the first by offering a competing substitute. This analysis embraces both the primary market for the work and any derivative markets . . . .

---

[17] In making this finding, the Court references its prior analysis in the discussion as to de minimis use, at Part III.A, as it is permitted to do. *See Ringgold*, 126 F.3d at 75 ("[D]e minimis might be considered relevant to the defense of fair use. One of the statutory factors to be assessed in making the fair use determination is 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole.' A defendant might contend, as the District Court concluded in this case, that the portion used was minimal and the use was so brief and indistinct as to tip the third fair use factor decisively against the plaintiff." (quoting 17 U.S.C. § 107(3))).

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021), *cert. granted*, 142 S.

Ct. 1412 (2022), *and aff'd sub nom. Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct.

1258 (2023) (citations omitted).  Courts look for more than a speculative harm; to have adverse

market effect, the copying must be of "sufficiently significant portions of the original as to make

available a significantly competing substitute."  *Authors Guild*, 804 F.3d at 223.  That is, copying "a

substantial portion" of the original work "may reveal . . . a greater likelihood of market harm,"

inasmuch as the use of the original work in the secondary work functions to "fulfill demand for the

original."  *Campbell*, 510 U.S. at 587.  In addition, there exists a "close linkage between the first and

fourth factors, in that the more the copying is done to achieve a purpose that differs from the

purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the

original."  *Id.*  This factor focuses on whether the use would "deprive the rights holder of significant

revenues because of the likelihood that potential purchasers may opt to acquire the copy in

preference to the original."  *Id.*

 Though "'[i]t is indisputable that, as a general matter, a copyright holder is entitled to

demand a royalty for licensing others to use its copyrighted work, and that the impact on potential

licensing revenues is a proper subject for consideration in assessing the fourth factor,' . . . . 'not

every effect on potential licensing revenues enters th[is] analysis . . . .'"  *Fox News Network, LLC v.*

*Tveyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (citations omitted).  "A copyright owner has no right to

demand that users take a license unless the use that would be made is one that would otherwise

infringe an exclusive right.  . . . [And e]ven if a use does infringe an exclusive right, '[o]nly an impact

on potential licensing revenues for traditional, reasonable, or likely to be developed markets should

be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work.'" *Id.* (citations omitted).[18]

The Film's fleeting use of the photographs in the background of a scene depicting a cultural performance cannot reasonably be expected to harm Plaintiff's ability to license his photographs for publication and use. As in *Bill Graham Archives*, the Court "do[es] not find a harm to [Plaintiff's] license market merely because [Defendants] did not pay a fee for [Plaintiff's] copyrighted images." 448 F.3d at 614. Here, as there, Plaintiff fails to "show[] impairment to a traditional, as opposed to a transformative market." *Id.* Since Defendants' use of Plaintiff's photographs is clearly transformative, "fall[ing] within a transformative market, [Plaintiff] does not suffer market harm due to the loss of license fees." *Id.* at 615. It seems highly implausible that someone in the market for Plaintiff's works could find a substitute in the obscured, ill-lit, fleeting images contained in the Film.

And in "balancing the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied," *Goldsmith*, 11 F.4th at 48, the benefit to the public in finding fair use here outweighs any personal gain to the copyright owner in the alternative. Documentarians cannot be asked to license or blur every single minute, incidental, fleeting depiction of a copyrighted work that happens to appear momentarily in the background of a substantively completely unrelated scene. Moreover, the incidental copying here was done to achieve a purpose far different from that of the original; thus, "the less likely it is that the copy will serve as a satisfactory substitute for the original." *Campbell*, 510 U.S. at 587. Accordingly, the fourth factor weighs strongly in favor of a finding of fair use.

---

[18] This limitation is necessary because "a copyright holder can always assert some degree of adverse [e]ffect on its potential licensing revenues as a consequence of the secondary use at issue simply because the copyright holder has not been paid a fee to permit that particular use. Thus, were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930, n.17 (2d Cir. 1994) (citations omitted) (emphasis in original).

### 5. Balance

Applying the general principles of the Copyright Act's fair use provision "requires judicial balancing, depending upon relevant circumstances." *Google LLC v. Oracle America, Inc.*, 141 S.Ct. 1183, 1197 (2021). "Copyright . . . trades off the benefits of incentives to create against the costs of restrictions on copying." *Goldsmith*, 143 S. Ct. at 1273. "The fair use doctrine 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Goldsmith*, 143 S. Ct. at 1274 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal quotation marks omitted)).

Here, weighing the four non-exclusive factors in light of the purposes of copyright, the Court finds that Defendants' transformative, fleeting, and incidental use of Plaintiff's photographs, which appear in the background of an under-one-minute scene of a 140-minute documentary, is fair use. The distinctly transformative purpose of Defendants' use of Plaintiff's photographs to markedly different ends from their original purpose; the fact that Defendants used the photographs so fleetingly and incidentally, erstwhile documenting the day-to-day activities of Eilish's life on tour; and the lack of any cognizable harm to Plaintiff's potential licensing market outweigh the neutral fact that the photographs are creative and published.

To hold otherwise would force documentarians to either blur, or obtain permission and pay licensing fees for every such fleeting, incidental, and momentary capture of any work of art in the background of a completely unrelated scene—where the work has not been consciously chosen for any decorative or thematic purpose, is simply *present* during the filming of unpredictable, unfolding, real-life events, and does not in any way supplant the market for the original work. Such a holding would not serve the copyright law's goal of promoting "the Progress of science and useful Arts." U.S. Const., art. I, § 8, cl. 8; *see Castle Rock*, 150 F.3d at 141 ("The ultimate test of fair use . . . is whether the copyright law's goal of 'promot[ing] the Progress of Science and useful Arts' 'would be

better served by allowing the use than by preventing it." (citations omitted)). An alternative ruling would hinder the arts' development, imposing too many "costs of restrictions on copying"—and de minimis copying, at that. *See Goldsmith*, 143 S. Ct. at 1273. Accordingly, Plaintiff has failed to state a claim that is plausible on its face.

## IV. LEAVE TO AMEND

Defendants' motion to dismiss is granted without leave to amend. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA*, 758 F.3d at 505. Any amendment to the complaint would be inherently futile because the works are what they are.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. Plaintiff's action is DISMISSED with prejudice.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 26, to enter judgment for Defendants, and to close this case.

SO ORDERED.

Dated: September 26, 2023
New York, New York

_____
GREGORY N. WOODS
United States District Judge