UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MCM GROUP 22 LLC

                              Plaintiff,

              -against-

LYNDON PERRY

                            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION
AND ORDER

22 Civ. 6157 (GBD)

GEORGE B. DANIELS, United States District Judge:

      Plaintiff MCM Group 22 LLC owns the copyrights to a pornographic video (the "Video".)
Plaintiff alleges that Defendant Lyndon Perry infringed upon its copyright protected material by
reproducing a still frame from the Video in a social media post. (Complaint, ECF No. 1 ¶ 31.)
Defendant moves to dismiss this action on fair use grounds. (See Mot. Dismiss, ECF No. 29.)
Because the defense of fair use is apparent on the face of the complaint, the motion is granted, and
the complaint is dismissed in its entirety.

## I.    FACTUAL BACKGROUND

      Plaintiff is a limited liability company and the owner by assignment of a registered
copyright for the Video. (Complaint ¶ 12.) Plaintiff's predecessor-in-interest is a non-party to this
suit and is referred throughout the Complaint as "Jane Doe." In 2015, Jane Doe appeared in the
Video, which was filmed by the founders and operators of Girlsdoporn.com and Girlsdotoys.com
(collectively, "GDP"). (Complaint ¶¶ 11, 13.) As revealed by a series of criminal cases, GDP was
a criminal sex trafficking enterprise, in which the website's operators recruited victims to appear
in its videos by fraudulently representing that the videos would never be posted online or released

in the United States.[1]  (*See id.* (referencing relevant criminal cases against GDP); Garcia

Restitution Order, ECF No. 29-1, at 3–4.)  On December 17, 2020, a GDP co-conspirator, Ruben

Andre Garcia, pled guilty to one count of conspiracy to commit sex trafficking, in violation of 18

U.S.C. § 1594(c), and one count of sex trafficking by force, fraud, or coercion in violation of 18

U.S.C. § 1594(c).  (Garcia Restitution Order at 2.)

On December 14, 2021, Judge Janis L. Sammartino of the Southern District of California,

pursuant to 18 U.S.C. § 1593, issued a restitution order in Garcia's case (the "Restitution Order")

that provided, *inter alia*, that the victims specified in the order "hold[] superior right, title, and

interest in the images, likenesses, and videos depicting that [victim] produced by GDP" and "shall

have and recover all property that GDP . . . took from them, including images, likenesses, videos,

and copyrights." (*Id.* at 5–6.)  Jane Doe was one of the specified victims, so the Restitution Order

awarded her "superior right, title, and interest" in the Video.[2]  (Complaint ¶ 15.)  She subsequently

assigned her rights in the Video to Plaintiff "for the purpose of prosecuting the use of copies, still

images, and derivatives of the [Video] through DMCA takedown notifications and, when

necessary, civil actions." (*Id.*)

On June 13, 2022, Defendant Lyndon Perry published a post (the "Tweet") on the social

media platform Twitter (currently known as X).  (Complaint ¶ 24.)  The Tweet included a

---

[1] In ruling on this motion to dismiss, this Court will consider the contents of the restitution order issued in *United States v. Garcia*, 3:19CR4488 (JLS) (S.D. Cal. Dec. 14, 2021). The Complaint incorporates the restitution order by reference, (Complaint ¶ 14,) and the restitution order is integral to the Complaint because it underlies the factual allegations establishing Plaintiff's ownership of the Video. *See Goel v. Bunge*, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (acknowledging that courts adjudicating 12(b)(6) motions may review documents that are "incorporated by reference in the complaint" or "integral" to the complaint's "terms and effects") (citations omitted).
[2] Defendant's motion to dismiss raises an alternative argument that the Restitution Order did not in fact transfer title to Jane Doe. (*See* Mot. Dismiss at 20–24.) Because this Court finds that the complaint fails to state an actionable claim for copyright violation, this Court will not address this alternative argument and will assume for the purposes of this motion that the Restitution Order properly transferred title.

composite of two images: a still frame from the Video superimposed onto a screenshot of an online article from Forbes.[3] (*See* Mot. Dismiss at 10.) The still frame from the Video depicts a fully clothed woman—who is identified as "Jessica" in the Video's title—sitting alone on a bed. The still frame includes text of an apparent conversation between the woman and an off-screen interviewer in which the woman states that she is studying business and marketing. The screenshot from the Forbes article shows a profile of an individual, who is identified as the head of institutional lending at Celsius Network, in the publication's 30 Under 30 list for 2020. The Tweet juxtaposes these two images, suggesting that they are the same woman.

The Tweet was Perry's second post in a larger thread. (*Id.* at 11.) The first post in the thread shows an advertisement for Celsius Network next to a screenshot of a Reuter's article entitled, "Crypto Firm Celsius Pauses All Transfers, Withdrawals, as Markets Tumble." Defendant then replied to this post with the Tweet, which included the composite image and the message "Same company btw."

Upon discovering the Tweet, Jane Doe requested that Twitter take down the Tweet pursuant to the Digital Millennium Copyright Act. (Mem. L. Opp. Mot. Dismiss ("Opp."), ECF. No. 32, at 2.) Twitter promptly removed the Tweet. (Complaint ¶ 27.)

On July 20, 2022, Plaintiff commenced this action alleging copyright infringement and seeking to enjoin Defendant from reposting or otherwise continuing to disseminate still frames

---

[3] While the Complaint does not include a picture of the alleged infringement, it does provide the URL where the Tweet appeared. (Complaint ¶ 24.) Accordingly, this Court will consider the Tweet as it has been incorporated by reference into the complaint and contains the alleged infringement, which is integral to the complaint. *See Goel*, 820 F.3d, at 559. When reviewing the Tweet, this Court need not credit Plaintiff's characterization. *See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) ("In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings.") (citations omitted).

from the Video. (*Id.* ¶ 28–38.) On March 20, 2023, Defendant moved to dismiss the matter for failure to state a claim for relief, (ECF No. 28,) and filed a memorandum of law, (Mot. Dismiss.) That same day, Plaintiff filed a brief in opposition, (Opp.,) and Defendant filed a reply, (Reply, ECF No. 30.)

## II.    LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When ruling on a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Claims merely "consistent" with liability are insufficient, *Twombly*, 550 U.S. at 557 and the "factual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555. Further, courts "are not to give effect to a complaint's assertions of law or legal conclusions couched as factual allegations." *Lynch v. City of New York*, 952 F.3d 67, 75–76 (2d Cir. 2020).

Here, Defendant does not dispute that the Tweet includes a reproduction of a still frame from the Video. Instead, Defendant argues that Plaintiff has failed to state a claim for copyright infringement because the Tweet clearly constitutes fair use. (Mot. Dismiss at 8.) While fair use is an affirmative defense most frequently resolved at summary judgment, the Second Circuit "has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016). "Accordingly, when the only two pieces of evidence needed to decide the

question of fair use are the original version and the allegedly infringing version, it is proper to decide the issue on a motion to dismiss." *Whiddon v. Buzzfeed, Inc.*, 638 F. Supp. 3d 342, 350 (S.D.N.Y. 2022) (citation omitted).

## III.    THE COMPLAINT CLEARLY ESTABLISHES THE DEFENSE OF FAIR USE

"The ultimate goal of copyright is to expand public knowledge and understanding, which copyright seeks to achieve by giving potential creators exclusive control over copying of their works, thus giving them a financial incentive to create informative, intellectually enriching works for public consumption." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015).

But while "[c]reative work is to be encouraged and rewarded, . . . private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and other arts." *Andy Warhol Found. For Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 598 U.S. 508, 526 (2023) (citation omitted).

The Copyright Act seeks to balance these "competing claims upon the public interest." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).  The Act "encourages creativity by granting the author of an original work 'a bundle of exclusive rights,'" which "includes the rights to reproduce the copyrighted work, to prepare derivative works, and, in the case of pictorial or graphic works, to display the copyrighted work publicly." *Warhol*, 598 U.S. at 526 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985)).  At the same time, the Act ensures the availability of creative work by, *inter alia*, limiting the scope of a copyright owner's rights. *See* 17 U.S.C. §§ 107–122.

This case centers on one such limitation: the defense of fair use.  "In 1976, Congress enacted § 107 of the Copyright Act, giving statutory recognition to the long existing common law doctrine of fair use." *Romanova v. Amilus Inc.*, 138 F.4th 104, 109 (2d Cir. 2025).  Section 107 provides that:

> [T]he fair use of a copyrighted work, . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>> (2) the nature of the copyrighted work;
>> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.

A defendant, while bearing the burden of proving that their use was fair, "need not establish that each of the factors set forth in § 107 weights in their favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004) (citation omitted).  "All four factors listed in § 107 are to be explored, and the results weighed together, in light of the purposes of copyright." *Santos v. Kimmel*, 745 F. Supp. 3d 153, 163 (S.D.N.Y. 2024), *aff'd*, 154 F.4th 30 (2d Cir. 2025) (citation omitted).

## A. The Purpose and Character of the Use

"A use that has a further purpose or different character is said to be 'transformative.'" *Warhol*, 598 U.S. at 529 (2023) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).  This includes uses that "transmit a message that differs from the message communicated by the original." *Romanova*, 138 F.4th at 118.  But as the Supreme Court recently clarified, accepting "any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works." *Warhol*, 598 U.S. at 529.  Thus, in addition to a further purpose or character, "there must be *justification* for copying." *Romanova*, 138 F.4th at 119

(emphasis in original). Examples of further justifications include instances in which the copying critiqued or commented on the original, "provided information to the public about the copied work, [] enabled the furnishing of valuable information on any subject of public interest, or rendered a valuable service to the public." *Id.* at 115. Notably, "the more transformative the [] work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 569.

Defendant argues that his use was transformative because Defendant posted the Tweet squarely for the purposes of commenting on Celsius' business struggles and its message differed from the original pornographic film. (Mot Dismiss at 15.) Plaintiff counters that the Tweet was "commercial" in nature and that additional facts must be developed through discovery to determine exactly what message the Tweet conveyed. (Opp. at 9–10.)

It is clear from the face of the Complaint that the Tweet utilized the still frame for a transformative purpose. The Video is a pornographic film with the express purpose of displaying explicit sexual content. Conversely, the Tweet does not contain any nudity or sexually explicit imagery and is framed as a commentary on Celsius. Defendant posted the Tweet as a direct reply to his previous tweet, which juxtaposed Celsius' marketing with critical reporting on the company. The Tweet's text—"Same company btw"—is a clear reference to Celsius when viewed in the context of the entire thread.

The Defendant's reproduction of the still frame in the composite image is in service of this commentary. The reproduction of a copyrighted image in a larger collage is transformative where "the copyrighted work is used as 'raw material,' in furtherance of distinct creative or communicative objectives." *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006). Here, Defendant superimposed the still frame from the Video over a Forbes profile of Celsius' former head of

international trading.  By arranging the images of two women, both identified as being named Jessica, side by side, the composite image vaguely implies that a Celsius executive appeared in a pornographic film.  The still frame's accompanying text stating that Jane Doe was studying business and marketing further supports this implication.

In short, a reasonable observer would understand the Tweet as a commentary on Celsius with a markedly different purpose from the original pornographic video.[4]  Further, as a commentary on a "subject of public interest" (i.e., Celsius' decision to pause its customer's transfers and withdrawals), the Tweet's transformative use of the still frame justifies its copying. *Romanova*, 138 F.4th at 115.

Plaintiff argues that the alleged "commercial" nature of the Tweet weighs against fair use. But even assuming that the Tweet was posted "for the purpose of achieving additional donations or pledges," (Complaint ¶ 34,) "that is not dispositive of the first factor, particularly in light of the inherently transformative role" of the Tweet, *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 32 (2021).  Thus, this Court's determination that the Tweet was "substantially transformative" allows it to discount the alleged "secondary commercial nature of the use." *NXIVM*, 364 F.3d at 478.

Accordingly, the first factor strongly weighs in favor of a finding of fair use.

## B. The Nature of the Copyrighted Work

When assessing the second fair use factor, courts consider two subfactors: "(1) whether it is "expressive or creative ... or more factual, with a greater leeway being allowed to a claim of fair

---

[4] This Court makes no finding as to what Defendant subjectively intended to communicate through the Tweet, as the Defendant's intentions are not alleged within the complaint or obvious from the Tweet itself. That said, one could likely surmise that Defendant intended to cast aspersions on Jane Doe's character and the judgment of Celsius for perhaps employing someone who had appeared in a pornographic film.  This opinion in no way approves or endorses that view.  For the purposes of deciding this motion, it is enough for this Court to note that whatever Defendant subjectively intended to communicate, it is clearly not sexually explicit or pornographic in nature.

use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Warhol*, 11 F.4th 26, 45 (2d Cir. 2021), *aff'd sub nom. Warhol*, 598 U.S. 508 (2023). But while "the creative nature of artistic images typically weighs in favor of the copyright holder, the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Blanch*, 467 F.3d, at 257 (citation omitted).

Defendant argues that the first subfactor weighs in favor of fair use because the Video is "not creative—it is an interview and intercourse; in essence, it is a documentary, making it an informational and functional work." (Mot. Dismiss at 17.) At this stage, however, this Court must take all allegations in the Complaint as true and draw all reasonable inferences in favor of Plaintiff. The complaint alleges only that "[t]he nature of the work is that it arises from criminal human trafficking activities." (Complaint ¶ 35.) Without more, this Court cannot determine whether the Video is more expressive or informational.

The second subfactor slightly favors the Defendant. The Restitution order Plaintiff cited in the Complaint states that GDP posted the pornographic videos it made with its victims to its websites and on "free porn sites such as Pornhub.com, one of the world's most visited websites." The videos GDP posted "were often viewed millions of times." (Garcia Restitution Order ¶ 3.) Under 17 U.S.C. § 101, "publication" includes "offering to distribute copies . . . to a group of persons for purposes of further distribution, public performance, or public display." Accordingly, the Video was published when originally uploaded to the GDP websites and other websites.

In sum, this second fair use factor is neutral; it does not weigh in favor of or against fair use. But as noted above, this factor is relatively less important to this Court's overall determination

9

because the Tweet is transformative. *See Authors Guild*, 804 F.3d at 220 ("The second factor has rarely played a significant role in the determination of a fair use dispute.")

## C. The Amount and Substantiality of the Portion Used

The third factor in the fair use inquiry is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "The ultimate question under this factor is whether 'the quantity and value of the materials used are reasonable in relation to the purpose of the copying.'" *Warhol*, 11 F.4th, at 46 (quoting *Campbell*, 510 U.S. at 586). "[E]ven a small amount of copying may fall outside the scope of fair use" where the alleged infringing work copies "the heart of the original work's creative expression." *Google*, 593 U.S. at 33. Conversely, "copying the entirety of a work is sometimes necessary to make a fair use." *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 90 (2d Cir. 2014).

Here, the third factor weighs in favor of the fair use defense. It is undisputed that the Tweet reproduced a single frame of a forty-six-minute video. Plaintiff contends that this objectively small amount of copying is not a fair use because "the 'heart of the work' is any portion [of the Video] that identifies [Jane Doe], specifically images of her face, given that she is the victim of criminal sex trafficking and the [Video] is the evidence thereof." (Opp. at 13.) But the central inquiry under this factor is not whether the portion copied is the most important part of the work to the copyright holder, but rather whether the portion copied contains the central creative expression of the original such that "the secondary work might serve as an effectively competing substitute for the original." *Authors Guild*, 804 F.3d, at 221. The Tweet does not capture the central expression of the Video and is not a substitute for the original. The heart, or core, of the Video is its sexually explicit imagery. The Tweet is not pornographically explicit and shows a fully clothed woman describing her career interests. Accordingly, because the Defendant copied

an insubstantial amount of the Video in furtherance of a transformative purpose, the third factor weighs in favor of fair use.

### D. The Effect Upon the Potential Market for the Original

The fourth fair use factor asks courts to assess "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor focuses on "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that the potential purchasers may opt to acquire the copy in preference to the original." *Authors Guild*, 804 F.3d, at 223. Like the other factors, a court's analysis of the market effect is often influenced by whether the secondary use is transformative. "[T]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original." *Cariou v. Prince*, 714 F.3d 694, 709 (2d Cir. 2013); *see also Campbell*, 510 U.S. at 591–92 ("[W]hen a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act.").

The fourth factor weighs in favor of fair use. As detailed above, Defendant's use of a single still frame from the Video was a transformative secondary use intended as a form of commentary on Celsius. Further, the Defendant's use of a single frame from the video did not include any sexually explicit imagery. In short, a person in the market for a sexually explicit, pornographic film would not turn to the Tweet. Because Defendant's use of the still frame would not, and could not, usurp the market for the Video, the fourth factor weighs in favor of fair use.

Plaintiff admits that the Tweet would not harm the market for the Video. (Opp. at 14.) Instead, Plaintiff argues that the Tweet "increas[es] the public's demand for and general prurient interest in the [Video]." (*Id.*) Plaintiff wishes to depress the demand for the Video and "use the Federal Copyright Law to control further dissemination of the [Video], or any portion thereof."

11

(*Id.*) Plaintiff's only support for this notion—that the fourth factor turns on a copyright owner's ability to completely control the market for the original work—is *Clean Flicks of Colorado, LLC v. Soderberg*, 433 F.Supp.2d 1236 (D. Colo. 2006). In Clean Flix, several movie studios alleged copyright infringement against companies that created and publicly distributed edited versions of the studios' movies that removed "sex, nudity, profanity and gory violence." *Id.* at 1238. When assessing the companies' fair use defense, the Court disregarded the companies' argument on the fourth factor that their reproductions increased the overall size of the market for the studios' movies. *Id.* at 1241–42. Rather, the Court held that the studios had an intrinsic "right to control the content of the copyrighted work" and that the copyright owner gets to decide "what audience [it] wants to reach." *Id.* at 1242.

But *Clean Flicks* carries minimal persuasive value here. Unlike the instant case, *Clean Flicks* dealt with substantial and non-transformative copying. When evaluating the first fair use factor, the *Clean Flicks* Court held that there was "nothing transformative about the edited copies." *Id.* at 1241. Further, when discussing the amount and substantiality of the portion used, the Court found that "the amount used is substantial for the movies are copied in almost their entirety." *Id.* Thus, *Clean Flicks* concerned near complete copies of movies that usurped the studios' derivative market for family-friendly adaptations. Its reasoning has no applicability where, like here, the alleged infringement has a transformative purpose that did not take the heart of the original work.

**** 

Considering all four factors, the defense of fair use is clearly established by the complaint, the documents incorporated by reference, and the documents integral to it. Defendant's use of the still frame was transformative, communicating a different purpose and message. The second factor is neutral while both the third and fourth factors strongly favor the defense. While Plaintiff and

Jane Doe may be engaged in a legitimate effort to control the reproduction and dissemination of the Video, their ability to do so extends only as far as copyright law allows. Accordingly, Defendant's motion to dismiss Plaintiff's claim for copyright infringement is granted.

## IV.    CONCLUSION

Defendant's motion to dismiss, (ECF No. 28), is GRANTED. The Clerk of Court is directed to close the case accordingly.

Dated: New York, New York
      February 3, 2026

                                 SO ORDERED.

                                 GEORGE B. DANIELS
                                 United States District Judge